JUDGE FORREST

**14 CV   9126**

ANDREW M. CALAMARI
REGIONAL DIRECTOR
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
Tel: (212) 336-0589 (Howard A. Fischer, Senior Trial Counsel)
Email: FischerH@SEC.Gov



RECEIVED
NOV 17 2014
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | 14-CV-  (  ) |
| -against- | |
| ANTHONY J. THOMPSON Jr., JAY FUNG, and ERIC VAN NGUYEN, | COMPLAINT |
| Defendants, | |
| -and- | |
| JOHN BABIKIAN and KENDALL THOMPSON, | |
| Relief Defendants. | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against defendants Anthony J. Thompson Jr. ("Thompson"), Jay Fung ("Fung"), and Eric Van

Nguyen ("Van Nguyen") (collectively, the "Defendants"), and relief defendants John Babikian

("Babikian") and Kendall Thompson ("K. Thompson") (collectively, the "Relief Defendants"),

alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This case involves five "pump-and-dump" schemes orchestrated by the Defendants to create demand for five penny stocks between November 2009 and September 2010, generating at least $10 million in ill-gotten gains for the Defendants and the Relief Defendants. Specifically, Thompson, Fung and Van Nguyen conducted campaigns to inflate the prices of penny stock issued by Blast Applications Inc. ("Blast), Smart Holdings, Inc. ("Smart Holdings"), Blue Gem Enterprise, Inc. ("Blue Gem"), Lyric Jeans, Inc. ("Lyric"), and Mass Hysteria Entertainment Company, Inc. ("Mass Hysteria").

2.      The Defendants' campaigns involved a series of misleading electronic marketing newsletters distributed by entities they controlled. The details of the five pump and dump schemes differed, but each involved the same general structure:

      a.      Defendants (or entities they controlled) acquired a significant amount, or the majority, of the publicly traded shares of each company;

      b.      Defendants sent misleading newsletters to prospective investors touting the companies and creating demand for the stocks, thereby pumping up the share prices;

      c.      Defendants sold their own shares at the artificially high price their promotion had created, thereby depressing the stocks' prices as they dumped their shares into the market; and

      d.      Defendants left unwitting investors with losses when the share prices dropped to their pre-promotion levels.

3.      Defendants' newsletters misleadingly stated that the Defendants "may" or "might" sell shares they owned when, in fact, Defendants always intended to sell and, in some cases were selling, the shares they owned of the companies they touted. The Defendants also (i) lied about the number of shares they possessed, along with any compensation for their promotional efforts; (ii) simultaneously with their recommendations of the penny stock

companies to investors, were selling shares that they or their companies received as compensation for the promotional campaign, and (iii) never disclosed that they were coordinating their promotion of the penny stocks in order to increase their prices.

4.     Thompson, Fung and Van Nguyen were not the only profiteers. Babikian received more than a million dollars in proceeds from one of the manipulations, and K. Thompson, Thompson's wife, received $200,000 in proceeds from one of the manipulations.

## VIOLATIONS

5.     By virtue of the conduct alleged herein, Thompson, Fung and Van Nguyen, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Sections 17(a) and 17(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a) and 77(q)(b)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## NATURE OF PROCEEDINGS AND RELIEF SOUGHT

6.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking a final judgment: (i) restraining and permanently enjoining Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein from which any has not previously been enjoined; (ii) requiring Defendants and Relief Defendants each to disgorge the ill-gotten gains they received as a result of the violations, and to pay prejudgment interest thereon, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; (iii) imposing civil monetary penalties upon Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and/or Section 21(d)(3) of the Exchange Act [15 U.S.C.

§ 78u(d)(3)]; (iv) requiring the Defendants and Relief Defendants to provide an accounting of all

assets relating to the activities alleged herein, pursuant to Section 21(d)(5) of the Exchange Act

[15 U.S.C. § 78u(d)(5)]; and (v) imposing a penny stock bar against Van Nguyen, pursuant to

Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange

Act [15 U.S.C. § 78u(d)(6)]. Finally, the Commission seeks any other relief the Court may deem

just and appropriate.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action under Sections 20(b), 20(d), and 22(a)

of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d) and 27 of the

Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], and 28 U.S.C. § 1331.

8.      Venue is proper in the Southern District of New York under Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

Certain of the acts, practices, transactions, and courses of business alleged in this Complaint

occurred within the Southern District of New York and were effected, directly or indirectly, by

making use of the means and instruments of transportation or communication in interstate

commerce, or the mails. For instance, Thompson held a brokerage account at a New York City

brokerage firm; numerous investors in the five companies are located in the Southern District of

New York; and shares transferred to Defendants Thompson, Fung and Van Nguyen were held

within the Southern District of New York.

## DEFENDANTS AND RELIEF DEFENDANTS

9.      **Anthony J. Thompson**, age 38, a resident of Bethesda, Maryland is a penny

stock promoter and was the managing director of and had ultimate authority over OTC Solutions

LLC ("OTC Solutions"), a now defunct entity based in Bethesda, Maryland. OTC Solutions

4

distributed electronic penny stock promotion newsletters, including ExplicitPicks.com, PremierPennyStocks.com, ExplicitPennyPicks.com, FreeInvestmentReport.com, FreePennyAlerts.com and OxofWallStreet.com. Thompson also controlled a company called Microcapster, Inc. ("Microcapster").

10.   **Jay Fung**, age 40, a resident of Delray Beach, Florida, is a penny stock promoter who controlled and had ultimate authority over Pudong, LLC ("Pudong"), a now defunct limited liability company located in Boca Raton, Florida. Pudong distributed electronic penny stock promotion newsletters, including PennyPic.com.

11.   **Eric Van Nguyen**, formerly resided in Montreal, Quebec, but his current whereabouts are unknown. Van Nguyen is a penny stock promoter who controlled and had ultimate authority over Golden Dragon Media, Inc. ("Golden Dragon Media"), a now defunct Nevada corporation formerly located in Henderson, Nevada that distributed newsletters promoting penny stocks. Van Nguyen also controlled Canada, Inc., an entity that received funds from the Lyric promotion. Golden Dragon Media distributed electronic penny stock promotion newsletters, including TitanStox.com, GoldenDragonMedia.com, SecretPennyStocks.com, UnrealStocks.com, MonsterStox.com, and InsanePicks.com.

12.   **John Babikian**, age 26, is a Canadian citizen (who is currently believed to reside abroad) who at the time of the conduct alleged herein resided in Montreal. Babikian operated a penny stock promotion business primarily from a web site named AwesomePennyStocks.com.

13.   **Kendall Thompson**, age 36, is a resident of Bethesda, Maryland.  She is married to Thompson.

<u>FACTS</u>

## I.    DEFENDANTS ORCHESTRATE THE BLAST PUMP AND DUMP

14.    Blast is a Delaware corporation with its principle place of business in Plainview, New York. Previously known as Medivisor, Inc., the company changed its name in July 2009 to Blast Applications, Inc. and changed its business classification from health services to web solutions and marketing. In its press releases the company described itself as "a premier creator and developer of applications for iPhone, iPad, Facebook, Twitter, and Android."

15.    Blast's stock is quoted on OTC Link (formerly the Pink Sheets) operated by OTC Markets LLC ("OTC Link") under the symbol BLAP. The registration of Blast's common stock with the Commission became effective on or about May 6, 2008, but as of the date of this Complaint the company has never complied with its quarterly or annual reporting obligations.

### A.    The Blast Promotion

16.    In or around November 11, 2009, Thompson's OTC Solutions acquired 18 million shares of Blast.

17.    Blast issued several press releases between October 26, 2009 and November 19, 2009, announcing positive news about the company.

18.    Between November 18 and November 20, 2009, newsletters controlled by Thompson and Fung touted Blast stock based on the company's press releases.

19.    On or about November 18, 2009, Thompson's ExplicitPicks.com issued a "Blockbuster Pick Alert" on Blast, making favorable statements about the company and its stock, including, for example:

        a.    referring to Blast as a "hidden gem" priced at $.0153 that "could be ready to make a power move";

b.    noting recent jumps in the stock price of other applications developers, and stating, "we believe [Blast] is flying under the radar" and that "it has the ability to shock micro-cap investors with serious percentage gains";

c.    claiming that ExplicitPicks.com had received e-mails from investors all over the world thanking it for its pick of Blast Applications;

d.    claiming that with the latest Blast news the stock could "potentially explode [from $0.0529 per share] towards $.10 or higher";

e.    boasting that "BLAP has got some serious buzz with the stock closing at $0.0529, an unbelievable first day gain of over 245% from yesterday's close and closing just off the highs of the day.  Ladies and gentlemen BLAP traded over 294 million shares today, now that is some serious strength";

f.    adding "BLAP is one of the CHEAPEST picks our team has decided to release a pick on!  Now investors see why we felt so comfortable with our pick on BLAP. Blast Applications had its BIGGEST volume day EVER today closing near the high of the day!  If that isn't a Bullish indicator we don't know what it [sic]!; and

g.    further adding that, "We are extremely confident that BLAP will continue its move north!! BLAP is sitting on a beautiful support level and we believe there are amazing gains to be made here. Traders flock to volume and strength and BLAP has both!!!"

20.    On or about November 18, 2009, Fung's PennyPic.com issued a "Special Alert" on Blast and made favorable statements regarding the company and its stock, including, for example:

a.    "[g]ive[n] the news BLAP recently announced, the company appears to be an undiscovered gold mine";

b.    claiming that Blast could be a "ground floor opportunity [that] could see 100% - 200% gains very quickly"; and

c.    predicting that "BLAP's first iPhone/iTouch application could make the company trade off the charts once it is released."

21.    On or about November 18, 2009, Van Nguyen's TitanStox.com – delivered with an email subject line that read "BLAP – My New Potential 500% Gainer!" – made favorable statements about Blast and its stock, including, for example:

    a.    claiming that Blast "looks … very bright in the short term";

    b.    predicting that the company's recent news announcement "could propel the stock to a whole new level";

    c.    boasting "my last pick soar [sic] over 500% within 2 days!" and "I have alerted on stocks that have soar [sic] over 200%, 300%, and 500% in the last couple of weeks"; and

    d.    assuring "I am extremely confident BLAP could be my next big winner!"

22.    These statements were materially misleading because, among other things, Defendants failed to inform investors that their own undisclosed trading contributed to much of the favorable price movements and increase in volume.

**B.    Defendants' Disclaimers Misled Investors.**

23.    In connection with the Blast promotion, newsletters that Thompson, Fung and Van Nguyen distributed contained various purported disclaimers. However, these disclaimers contained material misstatements and omissions.

24.    For example, the disclaimers misstated the consideration received for the promotional efforts. The November 18, 2009 Explicitpics.com newsletter (and the December 16, 2009 version of the web disclaimer) misstated that it had received 6 million shares. Pudong's Pennypic.com disclaimer falsely stated it had received 6 million shares.

25.    In addition, the disclaimers misstated the Defendants' intentions with respect to the shares they held. They stated that the Defendants "may" sell their shares when, in fact, their

intent all along was to sell their entire positions, if possible. In fact, at the time of many of these misleading disclosures Defendants already had begun the process of selling their positions.

26.     Finally, Defendants' newsletters failed to disclose that they were acting in concert through a variety of promotional outlets they controlled to pump up Blast's share price while simultaneously dumping the shares they owned onto the market. Indeed, emails between Thompson and Van Nguyen indicate that they planned to manipulate Blast's stock price and share in the proceeds when Thompson sold Blast stock at artificially inflated prices.

### C.    Defendants' Manipulation Artificially Inflated Blast's Share Price.

27.     Trading in Blast's shares responded to the manipulation, with price and volume spiking during the promotion and plunging after it ended. Blast shares rose from a closing price of $0.02 and volume of approximately 1.4 million shares on November 17, 2009 to $0.05 and volume of over 29 million shares on November 18, 2009, before falling after the end of the promotion, and after Defendants sold their shares.

28.     Thompson's OTC Solutions sold 18 million shares of Blast between November 17 and November 24, 2009, generating proceeds of $556,126.68.

29.     Thompson split the proceeds of his Blast share sales three ways with Fung and Van Nguyen.

## II.    DEFENDANTS ORCHESTRATE THE BLUE GEM PUMP AND DUMP

30.     Blue Gem is an inactive corporation headquartered in Opa-Locka, Florida. In September 2010, Blue Gem merged with Title Beverage Distribution, Inc. ("Title Distribution"), which became a wholly-owned subsidiary of Blue Gem. At the time of its merger into Blue Gem,

Title Distribution had been distributing its main product, an all-natural beverage called Title Sports Drink, for nearly a year.

31.    Blue Gem's annual reports for the years ended May 31, 2009 and May 31, 2010 contained an auditor's report that expressed substantial doubt about Blue Gem's ability to continue as a going concern. According to the company's Form 10-Q for the period ended August 31, 2010 filed with the Commission, the company did not begin earning revenue until May 2010. Blue Gem reported that it had a total net loss of $175,292 for the year ended May 31, 2010 and that Title Distribution had a net loss of $475,017 for the period from August 31, 2009 (inception) through April 30, 2010.

32.    Blue Gem first registered its common stock with the Commission in September 2009. Blue Gem's stock traded on the Over-the-Counter-Bulletin-Board under the symbol BGEM. It is currently listed on the OTC Link marketplace.

**A.    The Blue Gem Promotion**

33.    Between September and December 2009, Thompson's Microcapster acquired approximately 3.7 million shares of Blue Gem, and Pudong and Van Nguyen each acquired approximately 2.2 million shares.

34.    In December 2009, Blue Gem was a shell company with minimal activities in the mineral exploration business. While Blue Gem and Title Distribution signed a letter of intent to merge on December 8, 2009, that merger never occurred. It was not until August 2010 that Blue Gem and Title Distribution entered into a share exchange agreement that was completed on or about September 14, 2010. Thus, until mid-September 2010, Blue Gem did not receive any benefit from the purported activities of Title Distribution, even though, as set forth below, prior

to September 2010, Defendants Thompson, Fung and Van Nguyen each had been actively promoting Blue Gem on this false premise.

35.     Beginning on or about December 13 and 14, 2009, and continuing through and until approximately February 2, 2010, Thompson, Fung and Van Nguyen orchestrated a coordinated promotion of Blue Gem. Defendants each disseminated newsletters touting Blue Gem based primarily on its exclusive right to distribute Title Sports Drink, which the newsletters described as a new sports drink with great prospects. Among other things, the newsletters stated that Blue Gem distributed its products, including Title Sports Drink, throughout southern Florida.

36.     Thompson's newsletters – including ExplictPicks.com, OxofWallStreet.com, FreeInvestmentReport.com and KillerPennyStocks.com – falsely claimed their "business analysts visited [Blue Gem] and their warehouse facilities" and they were "absolutely confident in their products, business model and management!"

37.     On or about December 14, 2009, Thompson's newsletters predicted that Blue Gem's stock, which had closed at $0.35 per share on the previous trading day, could appreciate to more than $1.00 per share based on a recently-announced contract with a major Florida retail chain.

38.     Similarly, on or about December 14, 2009, Van Nguyen's TitanStox.com wrote that Blue Gem's contract with a major Florida retail chain was "massive news [that] could propel [Blue Gem] to well over $1.00 at this pace!"

39.     Fung's PennyPic.com newsletter claimed that Title Sports Drink (a) "is scientifically established to have more electrolytes than Gatorade and more energy naturally than

any drink on the market today"; and (b) "owns the exclusive rights to use 72 ionic trace minerals." This statement was false.  Title Sports Drink did not have "exclusive rights to use 72 ionic trace minerals," as claimed.  In fact, ionic trace minerals are dissolved, naturally-occurring minerals that cannot be claimed for exclusive rights.

40.     On December 16, 2009, newsletters that Defendants controlled announced that Grass Roots Research ("GRR") had issued a recommendation to buy Blue Gem shares, which GRR expected to trade at $1.01 per share. For example, Thompson's ExplicitPicks.com told subscribers that GRR "did an in-depth analysis of Blue Gem," and, among other things, noted that Blue Gem's "average gross margin on case sales of allied brands is over 40%."  Defendants' newsletters, which referred to GRR as an independent analyst, also included a link to GRR's report. However, at no time did the Defendants disclose that the entity that paid for GRR's research in fact was owned by Van Nguyen, rendering statements about GRR's independence materially false.

41.     Predictions in newsletters controlled by Thompson and Van Nguyen on December 14, 2009 that Blue Gem's stock could trade at $1.00 or more per share were baseless. The share price had closed the previous day at $0.35, and Blue Gem was a shell company with no operations in the beverage distribution business or any contracts for beverage distribution.

42.     Defendants either knew that many or all of their statements were false and/or misleading or recklessly disregarded their truth or falsity.

### B.  Defendants' Disclaimers Misled Investors.

43.  Thompson's and Fung's newsletters recommending Blue Gem included various purported disclaimers. However, these disclaimers contained material misstatements and omissions.

44.  For example, the disclaimers misstated the consideration received for the promotional efforts. For one, Thompson's Explicitpics.com disclaimer falsely stated that it had received 1.5 million shares, when in fact Thompson had more than 3.7 million shares. For another, Van Nguyen's TitanStox.com newsletter did not disclose in December 2009 that Van Nguyen and entities he controlled received compensation in connection with the Blue Gem promotion.

45.  In addition, the disclaimers misstated the Defendants' intentions with respect to the shares they held. They stated that the Defendants "may" sell their shares when, in fact, their intent all along was to sell their entire positions, if possible. In fact, at the time of many of these misleading disclosures Defendants already had begun the process of selling their positions.

46.  Finally, Defendants' newsletters failed to disclose that they were acting in concert through a variety of promotional outlets they controlled to pump up Blue Gem's share price while simultaneously dumping the shares they owned onto the market.

### C.  Defendants' Manipulation Artificially Inflated Blue Gem's Share Price.

47.  Thompson's, Fung's and Van Nguyen's first newsletters were disseminated on Sunday, December 13, 2009, and the promotional campaign began in earnest on Monday, December 14, 2009. In response to Defendants' promotion, Blue Gem's price and volume both increased substantially. On December 14, 2009, Blue Gem's stock closed at $0.65 per share,

more than 85% higher than the previous trading day's close of $0.35 per share. Trading volume jumped nearly three-fold that day, from 4,732,300 to 13,331,300. From December 14 through 21, 2009, the closing price of Blue Gem stock ranged from a high of $0.65 (December 14) to a low of $0.46 (December 21). Trading volume peaked at 13,742,200 shares on December 15, 2009. On December 22, 2009, after the first wave of promotional newsletters stopped, the closing price fell to $0.30 per share.

48.     Between December 14 and December 17, 2009 Van Nguyen sold his 2,250,001 Blue Gem shares, resulting in proceeds of $1,285,400.

49.     Fung's Pudong sold 2,250,001 Blue Gem shares between December 1 and December 17, 2009 for proceeds of $1,176,681.

50.     On December 22, 2009 Pudong wired $1,176,000 to a bank account in Cypress of an entity controlled by Relief Defendant Babikian.

51.     Thompson's Microcapster sold 2,803,001 Blue Gem shares between December 10 and December 21, 2009 for proceeds of $1,167,344. On December 22, 2009, Thompson's Microcapster wired $1,109,366 to its bank account. On December 22, 2009, Thompson's Microcapster wired $219,000 from its bank account to Fung's Pudong and $130,000 to Van Nguyen.

52.     On December 23, 2009, Thompson's Microcapster wired $200,000 from its bank account to Relief Defendant K. Thompson and $125,000 from the same bank account to OTC Solutions.

### III.   DEFENDANTS ORCHESTRATE THE LYRIC PUMP AND DUMP

53.   Lyric is a Florida corporation doing business in Los Angeles, California.  Lyric describes itself as a licensing and branding company which designs, manufactures, markets, and distributes apparel and accessories.

54.   Lyric does not have any stock registered with the Commission. Its stock is quoted on the OTC Link marketplace under the symbol LYJN.

#### A.   The Lyric Promotion

55.   Through a series of sham transactions, Thompson's OTC Solutions acquired 35 million shares of Lyric.

56.   On March 18, 2010, Lyric issued a press release describing the company's "advancements" over the past year, including the distribution of its products to prominent retail stores, including Nordstrom and Bloomingdale's.

57.   Thompson, Fung and Van Nguyen distributed electronic newsletters promoting Lyric from March 19, 2010, the day after Lyric's press release, through March 23, 2010.

58.   Thompson's ExplicitPicks.com issued a "Blockbuster Alert" on Lyric on March 19, 2010 claiming that "after significant research and due diligence, our business analysts feel LYJN has the potential to bring our subscribers monster returns!" The newsletter claimed "LYJN has more fundamentals than any other stock our team has been able to find at these price levels," and "the stock has already started to see recent momentum since a corporate update was released via Marketwire the other day." Thompson's ExplicitPicks.com continued, on March 21, 2010: "After further due diligence, we are more then [sic] convinced that LYJN could be poised for MASSIVE GAINS this coming week."

59.     Thompson's ExplicitPicks.com told its subscribers that momentum investors holding short positions in more than 10 million shares of LYJN could potentially cover their positions "this week," thus driving the price higher: "We've watched shorts covering their positions in the past and when it happens stocks can jump from 200% to over 500% very quickly!"

60.     Thompson's ExplicitPicks.com cited the dramatic increase in Lyric's stock price since the beginning of the promotion as evidence of the stock's potential, stating on March 22, 2010, "since our alert went out the stock is up over 40%." Three hours later, ExplicitPicks.com disseminated another newsletter stating, "LYJN soared over 91% today on more than 127 mill shares traded and closed at the high of the day!"

61.     Van Nguyen's MonsterStox.com issued an electronic newsletter on March 22, 2010, with the subject line, "LYJN is a Potential 1000% Gainer -Watch out Above." As Thompson's ExplicitPicks.com had, Van Nguyen's MonsterStox.com emphasized potentially "massive" gains from short sellers covering their positions, writing:

   a.     "We watched the trading on LYJN all morning and believe that there is a MASSIVE short position that is about to be covered!";

   b.     "We think the shorts are about to COVER (or buyback) a HUGE AMOUNT of stocks!"; and

   c.     "I have seen short squeeze [sic] cause stocks to jump over 1000% in the past!"

62.     Van Nguyen's MonsterStox.com predicted that "tonight" the short position would probably increase from 11 million shares to 15 million shares, creating "a HUGE opportunity for investors who are looking for massive gain in a short squeeze play! …This Could be The Opportunity of a Lifetime to Participate in a MAJOR RUN AHEAD!"

63.     Fung's PennyPic.com newsletter on March 23, 2010 made similar claims about potential "major gains," and even used the some of the same language and punctuation, such as "This Could be The Opportunity of a Lifetime to Participate in a MAJOR RUN AHEAD!"

64.     Fung's PennyPic.com's newsletters, distributed in various iterations during the day on March 23, 2010 further claimed that:

    a.     Lyric's stock "was up over 80% today on over 100 million shares in volume again!";

    b.     With 43 million shares short the previous day, "we believe the covering could continue today and this coming week";

    c.     The PennyPic.com team had seen short squeezes in the past that made stocks move up "over 500% to 1000%"; and

    d.     Lyric's stock "traded almost 200 million shares" and ended the day nearly doubling its price.

65.     Defendants either knew that many or all of their statements were false and/or misleading or recklessly disregarded their truth or falsity. For example, Defendants failed to inform investors that their own undisclosed trading contributed to much of the favorable price movements and increase in volume.

**B.     Defendants' Disclaimers Misled Investors.**

66.     In connection with the Lyric promotion, newsletters the Defendants distributed contained various purported disclaimers. However, these disclaimers contained material misstatements and omissions.

67.     For example, the disclaimers misstated the consideration received for the promotional efforts. While MonsterStox.com disclosed that it would receive up to $400,000 for the promotion, it did not disclose that Van Nguyen, who controlled MonsterStox.com, actually received $760,000 through his company Canada, Inc.

68.     In addition, the disclaimers misstated the Defendants' intentions with respect to the shares they held. They stated that the Defendants "may" sell their shares when, in fact, their intent all along was to sell their entire positions, if possible. In fact, at the time of these misleading disclosures Defendants already had begun the process of selling their positions.

69.     Finally, Defendants' newsletters failed to disclose that they were acting in concert through a variety of promotional outlets they controlled to pump up Lyric's share price while simultaneously dumping the shares they owned onto the market.

**C.      Defendants Artificially Inflated Lyric's Share Price, and Profited from Sales.**

70.     Thompson's, Fung's and Van Nguyen's promotional campaigns dramatically increased Lyric's price and volume, both of which fell precipitously when the promotion ended. On March 16, 2010, two days before Lyric issued its press release, Lyric's stock closed at less than a third of a penny, $0.0031, on trading volume of 102,519 shares. The next day Lyric's stock price and trading volume began to climb, closing at $0.015 per share with 2,974,193 shares traded. On March 18, 2010, the day Lyric issued its press release, Lyric's closing price climbed again, to $0.0221, and volume jumped more than 1,400% to 46,518,257 shares. On Friday, March 19, 2010, the day the newsletter campaign began, the closing price increased slightly to $0.024, while volume dropped to 34,581,499 shares. On the second and third day of the promotion there were dramatic increases in price and volume. On Monday, March 22, the closing price increased from $0.024 the previous trading day to $0.046, with 128,000,000 shares traded. On March 23, the price of Lyric stock again nearly doubled, closing at $0.080 per share, with volume increasing to 190,000,000 shares. After the promotion stopped, Lyric's stock price declined. On March 31, 2010, the price of Lyric's stock was down to $0.0510. On April 7, 2010, Lyric's closing price was $0.037.

71.     Thompson's OTC Solutions sold 35,000,000 shares of Lyric from its account at a New York City brokerage firm between March 18 and 24, 2010, resulting in proceeds of $1,510,578. OTC Solutions then wired $90,000 to Pudong, $250,000 to Thompson, and $760,000 to a company controlled by Van Nguyen.

## IV.    DEFENDANTS ORCHESTRATE THE SMART HOLDINGS PUMP AND DUMP

72.     Smart Holdings is a Nevada corporation with its principal place of business in Marietta, Georgia that purported to engage in a variety of businesses, including selling automotive extended warranties. Shares of Smart Holdings common stock are registered with the Commission and quoted on the OTC Link marketplace under the symbol SMHS.

### A.    The Smart Holdings Promotion

73.     On or about March 19, 2010, Thompson's OTC Solutions, Fung's Pudong and Van Nguyen each purchased 125,000 shares of Smart Holdings. Smart Holdings effected a 16:1 forward stock split on or about May 6, 2010, which resulted in Defendants each holding 2,000,000 shares of Smart Holdings. Although these shares were purportedly reissued to other entities, Defendants economically benefitted from the acts described herein, as shown below.

74.     From September 17 through September 21, 2010, the Defendants' electronic newsletters promoted Smart Holdings.

75.     Thompson's OxofWallStreet.com newsletter claimed that Smart Holdings' recent listing on the OTC Link market place was "like" an initial public offering, giving investors a first look at the company.

76.     Another Thompson-controlled newsletter, FreeInvestmentReport.com, similarly suggested that Smart Holdings recently had conducted an initial public offering, writing: "We couldn't be more excited to bring our subscribers a newly traded public company like SMHS!

We absolutely love IPO picks, [and] our team feels SMHS has a sound business model!"

77.     Fung's PennyPic.com's September 21, 2010 newsletter made similarly positive statements about Smart Holdings' business prospects.

78.     Fung's PennyPic.com's September 21, 2010 newsletter added that according to Smart Holdings' recent press release, a media test indicated that if Smart Holdings spent $50,000 a week on a television campaign, it could generate 10,000 leads a month that would yield monthly gross revenue of approximately $2.5 million.  Based on this revenue model, PennyPic.com stated that Smart Holdings anticipated $30 million dollars in yearly gross revenue.

79.     Van Nguyen's MonsterStox.com newsletter also made positive statements about Smart Holdings' business and potential.  It wrote, among other things:

   a.     "We believe this stock still offers massive upside potential as the price gain and fundamentals of the company are very compelling to us!;

   b.     "SMHS could hold massive upside potential and could attract massive investment in the future!";

   c.     "SMHS could be the Next GEM in the Auto Insurance space to soar in value!"

80.     Defendants either knew that many or all of these statements were false and/or misleading or recklessly disregarded their truth or falsity. Among other things, Defendants knew or recklessly disregarded the fact that a listing on the OTC Link market place was not like an IPO.

**B.     Defendants' Disclaimers Misled Investors.**

81.     In connection with the Smart Holdings promotion, newsletters Defendants distributed contained various purported disclaimers.  However, these disclaimers contained material misstatements and omissions.

82.     For example, the disclaimers misstated the consideration received for the

promotional efforts. While OxofWallStreet.com disclosed that it was paid $375,000 for the promotion, Thompson, who controlled OxofWallStreet.com, in fact received $1.1 million for promoting Smart Holdings. PennyPic.com's disclosure that it received $400,000 was misleading because Fung, who controlled PennyPic.com, received $470,000 for the promotion through his company, Pudong. MonsterStox.com's disclosure that it expected to be paid $300,000 was misleading insofar as its parent company, Van Nguyen's Golden Dragon Media, received $735,000 for the promotion.

83.     In addition, the disclaimers misstated the Defendants' intentions with respect to the shares they held.  They stated that the Defendants "may" sell their shares when, in fact, their intent all along was to sell their entire positions, if possible.  In fact, at the time of these misleading disclosures Defendants already had begun the process of selling their positions.

84.     Finally, Defendants' newsletters failed to disclose that they were acting in concert through a variety of promotional outlets they controlled to pump up Smart Holdings' share price while simultaneously dumping the shares they owned onto the market.

**C.      Defendants Inflated Smart Holdings' Share Price, and Profited from Sales.**

85.     The Smart Holdings promotion began as soon as the stock was listed for trading. On September 17, 2010, Smart Holdings' first day of trading (which was also the first day of the promotion), its stock closed at $0.25 per share on volume of 12,500 shares. The next trading day the closing price climbed to $0.31 per share and trading volume skyrocketed to 27,784,825 shares. On September 21, 2010, the price fell to $0.17 with 12,839,784 shares traded. When the promotion ended, the stock price fell sharply. On September 22, 2010, the closing price dropped to $0.10 per share. By September 30, 2010, the closing price was down to $0.065 per share and

trading volume was down to 1,029,629 shares. By the end of October the closing price was $0.015 per share.

86.     As a result of the acts described above and the resulting sale of the shares, Defendant Thompson ultimately obtained $1.1 million; Defendant Van Nguyen obtained $735,000; and Defendant Fung obtained $470,000.

## V.     DEFENDANTS ORCHESTRATE THE MASS HYSTERIA PUMP AND DUMP

87.     Mass Hysteria, formerly a handbag manufacturing company called Michael Lambert, Inc., in August 2009 changed its name and its business to become a development stage multi-media entertainment company that purportedly planned to produce feature films for theatrical, DVD, video on demand and television distribution.  It was located in Hollywood, California in 2009 and 2010.

88.     Mass Hysteria's common stock is registered with the Commission and quoted on the OTC Link marketplace under the symbol MHYS. It reported no revenue and a net loss of $2,052,019 for the fiscal year ended November 30, 2009.

### A.     The Mass Hysteria Promotion

89.     In June 2009, Thompson's Microcapster and OTC Solutions together acquired 670,677 shares of Michael Lambert, Inc., which in August 2009 changed its name to Mass Hysteria and effected a forward stock split.  The forward split resulted in Microcapster holding 1.8 million shares of Mass Hysteria and OTC Solutions holding 212,000 shares, for a total of more than 2 million shares of Mass Hysteria under Thompson's control.

90.     In January 2010, Thompson's OTC Solutions, Fung's Pudong and Van Nguyen exercised the convertible features of certain promissory notes from Mass Hysteria. This resulted in OTC Solutions acquiring 2.1 million additional shares of Mass Hysteria (giving Thompson a

total of more than 4 million shares of the company); Fung's Pudong acquiring 3.3 million shares of Mass Hysteria; and Van Nguyen acquiring an additional 500,000 shares of Mass Hysteria. On January 18, 2010, Van Nguyen's MonsterStox.com issued a newsletter that touted Mass Hysteria. The next day, Thompson's ExplicitPicks.com distributed a "Blockbuster Pick Alert" on Mass Hysteria which, among other things, claimed that Mass Hysteria's core management team had a combined $1.36 billion in box office sales.

91.     Defendants Van Nguyen and Thompson either knew many or all of the statements in the newsletters were false and/or misleading or recklessly disregarded their truth or falsity.

**B.     Defendants' Disclaimers Misled Investors.**

92.     In connection with the Mass Hysteria promotion, newsletters Thompson and Van Nguyen distributed contained various purported disclaimers. However, these disclaimers contained material misstatements and omissions.

93.     For example, the disclaimers misstated the consideration received for the promotional efforts. At least some of the newsletters distributed by Van Nguyen's MonsterStox.com did not include disclaimers or disclosure of Van Nguyen's holdings in Mass Hysteria, or that he received $656,290 for promoting Mass Hysteria.

94.     In addition, the disclaimers misstated their intentions with respect to the shares they held. They stated that they "may" sell their shares when, in fact, their intent all along was to sell their entire positions, if possible. In truth, at the time of these misleading disclosures they already had begun the process of selling their positions.

95.     Finally, their newsletters failed to disclose that they were acting in concert through a variety of promotional outlets they controlled to pump up Mass Hysteria's share price while simultaneously dumping the shares they owned onto the market.

C.    **Defendants Inflated Mass Hysteria's Share Price, and Profited from Sales.**

96.    Between January 4 and 13, 2010, the closing share price of Mass Hysteria ranged from $0.06 to $0.09 on limited trading volume. On January 19, 2010, with the promotion underway, the closing price of Mass Hysteria's stock more than doubled, rising from $0.13 per share on the previous day of trading to $0.30 per share. Volume increased from 216,415 shares to 11,890,243 shares. On January 20, with the promotion ending, the price fell 30%, to $0.21 per share with 15,830,607 shares traded. From January 22, through February 1, 2010, the stock traded in the range of $0.16 to $0.22 per share, with volume ranging between 216,498 and 2,005,466 shares. The next day, the price fell to $0.134 per share. By February 10, 2010, Mass Hysteria's stock had fallen to $0.10 with 124,300 shares traded.

97.    Fung's Pudong sold 3,300,000 shares of Mass Hysteria between January 19 and 27, 2010, resulting in proceeds of $775,094.

98.    Thompson's OTC Solutions sold 3,512,001 shares of Mass Hysteria between January 25 and 27, 2010, resulting in proceeds of $731,092 (of which $165,000 was wired to an entity controlled by Van Nguyen).

99.    Van Nguyen sold 3,310,002 shares of Mass Hysteria between January 22 and 26, 2010, resulting in proceeds of $656,290.

### FIRST CLAIM FOR RELIEF
Violations of Section 17(a) of the Securities Act
(Thompson, Fung, Van Nguyen)

100.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 99, as if fully set forth herein.

101.    By engaging in the acts and conduct described in this Complaint, each of Thompson, Fung and Van Nguyen, directly or indirectly, knowingly or recklessly, singly or in

concert in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or by the use of the mails, with scienter, has obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102.    These acts were material because, among other things, they misrepresented or omitted facts that were important to investors as they weighed decisions to purchase or sell the securities of Blast, Blue Gem, Lyric, Smart Holdings and/or Mass Hysteria.

103.    By reason of the foregoing, Thompson, Fung and Van Nguyen, directly or indirectly, violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
**Violations of Section 17(b) of the Securities Act
(Thompson, Fung, Van Nguyen)**

104.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 103, as if fully set forth herein.

105.    Each of Thompson, Fung and Van Nguyen, directly or indirectly, singly or in concert has, by use of the means or instruments of transportation or communication in interstate commerce, or by the use of the mails, published, given publicity to, or circulated a notice, circular, advertisement, newspaper article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without

fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

106.   By reason of the foregoing, Defendants Thompson, Fung and Van Nguyen, directly or indirectly, violated, and unless enjoined will again violate, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

**THIRD CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Thompson, Fung, and Van Nguyen)**

107.   The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 106, as if fully set forth herein.

108.   Each of Thompson, Fung and Van Nguyen, in connection with the purchase or sale of securities, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with scienter, has made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

109.   The misstatements and omissions of fact detailed above were material because, among other things, they misrepresented or omitted facts that were important to investors as they weighed decisions to purchase or sell the securities of Blast, Blue Gem, Lyric, Smart Holdings and/or Mass Hysteria.

110.   By reason of the foregoing, Defendants Thompson, Fung and Van Nguyen, directly or indirectly, violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Babikian and K. Thompson)

111.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 110, as if fully set forth herein.

112.    Relief Defendants Babikian and K. Thompson obtained money and/or property as

a result of the fraudulent acts alleged above under circumstances in which it is not just, equitable,

or conscionable for the Relief Defendants to retain these ill-gotten gains.  Relief Defendants have

no legitimate claim to this money and/or property.  Relief Defendants therefore have been

unjustly enriched.

113.    By reason of the foregoing, the Relief Defendants should disgorge their ill-gotten

gains, plus prejudgment interest thereon.


## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court issue a

Final Judgment:

### I.

Permanently restraining and enjoining:

(a)    Defendant Van Nguyen, and his agents, servants, employees and attorneys, and

all persons in active concert or participation with them who receive actual notice

of the injunction by personal service or otherwise, from violating Section 17(a) of

the Securities Act [15 U.S.C. § 77q(a)], pursuant to Section 20(b) of the Securities

Act [15 U.S.C. § 77t(b)];

(b)     Defendants Thompson, Fung and Van Nguyen, and their agents, servants,

employees and attorneys, and all persons in active concert or participation with

them who receive actual notice of the injunction by personal service or otherwise,

from violating Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)], pursuant

to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)]; and

(c)     Defendant Van Nguyen, and his agents, servants, employees and attorneys, and

all persons in active concert or participation with them who receive actual notice

of the injunction by personal service or otherwise, from violating Section 10(b) of

the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §

240.10b-5], pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. §

78u(d)(1)].

## II.

Ordering Defendants Thompson, Fung, Van Nguyen, and Relief Defendants Babikian

and K. Thompson each to provide sworn accountings, pursuant to Section 21(d)(5) of the

Exchange Act [15 U.S.C. § 78u(d)(5)], to determine the profit reaped from the conduct described

above, the location of their assets, and their ability to pay disgorgement and civil monetary

penalties;

## III.

Ordering Defendants Thompson, Fung, Van Nguyen, and Relief Defendants Babikian

and K. Thompson to disgorge any and all ill-gotten gains they received as a result of the

violations of the federal securities laws, plus prejudgment interest thereon, pursuant to Section

21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)];

**IV.**

Ordering Defendants Thompson, Fung and Van Nguyen to pay civil money penalties

pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and/or Section 21(d)(3) of

the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws;

**V.**

Ordering Defendant Van Nguyen to be barred from participation in any offering of a

penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or Section

21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and

## VI.

Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      November 17, 2014

By: _____
Andrew M. Calamari
SECURITIES AND EXCHANGE COMMISSION
Regional Director
Howard A. Fischer, Senior Trial Counsel
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0589 (Fischer)
Email: FischerH@SEC.gov

Of Counsel:
Sanjay Wadhwa (WadhwaS@sec.gov)
Thomas P. Smith Jr. (SmithTh@sec.gov)
Peter A. Pizzani Jr. (PizzaniP@sec.gov)