UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

ANTHONY J. THOMPSON Jr.,
JAY FUNG, and ERIC VAN NGUYEN,

Defendants,

-and-

JOHN BABIKIAN and KENDALL THOMPSON,

Relief Defendants.

14-CV-9126 (KBF)

## DECLARATION OF PETER PIZZANI IN SUPPORT OF THE SECURITIES AND EXCHANGE COMMISSION's MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ANTHONY J. THOMPSON'S MOTION FOR SUMMARY JUDGMENT

1.      I am employed as an attorney in the Enforcement Division in the New York Regional Office of the applicant Securities and Exchange Commission ("SEC").  I have worked as a staff attorney for the SEC for over 18 years.

2.      I submit this declaration, made with my personal knowledge, except where otherwise stated, in opposition to the motion for summary judgment submitted by defendant Anthony J. Thompson in the above-captioned proceedings.

The Allegations of this Case

3.      The Complaint in this action, attached to this Declaration as Exhibit A ("Comp.") sets out a series of securities laws violations relating to five separate issuers, and the persons

involved in pump-and-dump schemes relating thereto. Among other defendants, it outlines Thompson's participation in these five separate pump and dump schemes whereby Thompson and the other defendants conducted campaigns to inflate the value of five penny stock issuers. Comp. ¶ 1. The five penny stock companies at issue in the Complaint included Blast Applications Inc. ("Blast), Smart Holdings, Inc. ("Smart Holdings"), Blue Gem Enterprise, Inc. ("Blue Gem"), Lyric Jeans, Inc. ("Lyric"), and Mass Hysteria Entertainment Company, Inc. ("Mass Hysteria"). Comp. ¶ 1. Thompson was the managing director of and had ultimate authority over OTC Solutions LLC ("OTC Solutions"), a now defunct entity based in Bethesda, Maryland. Comp. ¶ 9.  OTC Solutions distributed certain electronic penny stock promotion newsletters, including ExplicitPicks.com, PremierPennyStocks.com, ExplicitPennyPicks.com, FreeInvestmentReport.com, FreePennyAlerts.com and OxofWallStreet.com. Thompson also controlled a company called Microcapster, Inc. ("Microcapster"). Id.

   4.  The separate schemes all employed common components: First, Defendants, including Thompson, would acquire a significant amount, sometimes the majority, of the shares of these issuers. Comp. ¶ 16 (around November 11, 2009, Thompson's OTC Solutions acquired 18 million shares of Blast); Comp. ¶¶ 33-34 (between September and December 2009, Thompson's Microcapster acquired approximately 3.7 million shares of Blue Gem); Comp. ¶¶ 54-55, 58 (Thompson's OTC Solutions acquired 35 million shares of Lyric, a penny stock quoted on the OTC Link marketplace under the symbol LYJN); Comp. ¶¶ 89-90 (describing how Thompson's Microcapster and OTC Solutions engaged in various acts that resulted in Microcapster holding 1.8 million shares of Mass Hysteria and OTC Solutions holding 212,000 shares, for a total of more than 2 million shares of Mass Hysteria, and then, through the exercise of certain promissory notes, resulted in OTC Solutions acquiring 2.1 million additional shares of

Mass Hysteria, giving Thompson a total of more than 4 million shares of the company); and

Comp. ¶ 73 (describing how Thompson, through OTC Solutions obtained, in early 2010,

2,000,000 shares of Smart Holdings).

5.　　　　Second, Defendants (including Thompson) would distribute misleading electronic

marketing letters through entities they controlled, creating demand by touting the issuers through

a barrage of falsehoods or misleading omissions of material fact. *See, e.g.*, Comp. ¶¶ 19-22; 35-

42; 59-65; 75-80; 90-91.

6.　　　　Third, along with the other Defendants, Thompson made a number of

misrepresentations and omissions in the materials disseminated by the entities he controlled,

including:

　　　　a.　Thompson lied about the consideration received for pumping the shares. *See, e.g.*, Comp. ¶¶ 23-24 (misstating the number of shares Thompson received for promoting Blast); Comp. ¶¶ 43-44 (Thompson's Explicitpics.com disclaimer falsely stated that it had received 1.5 million shares of Blue Gem, when in fact Thompson had more than 3.7 million shares); Comp. ¶¶ 66-67 (Lyric compensation); Comp. ¶ 82 (While OxofWallStreet.com disclosed that it was paid $375,000 for the Smart Holdings promotion, Thompson, who controlled OxofWallStreet.com, in fact received $1.1 million);

　　　　b.　Thompson misstated his intent with respect to selling those shares. *See, e.g.*, Comp. ¶ 25 (misstating that the defendants "may" sell their shares when, in fact, their intent all along was to sell their entire positions, if possible. In fact, at the time of many of these misleading disclosures defendants already had begun the process of selling their positions); Comp. ¶ 45 (with respect to Blue Gem); Comp. ¶ 68 (with respect to Lyric); Comp. ¶ 83 (as to Smart Holdings); Comp. ¶ 94 (as to Mass Hysteria).

　　　　c.　Thompson's disclosures omitted the fact that he was acting in concert with others to pump up the price of the issuers he promoted. *See, e.g.*, Comp. ¶ 26 (newsletters failed to disclose that they were acting in concert through a variety of promotional outlets they controlled to pump up Blast's share price while simultaneously dumping the shares they owned onto the market);

Comp. ¶ 46 (relating to Blue Gem); Comp. ¶ 69 (Lyric); Comp. ¶ 83-84 (concerning Smart Holdings); Comp. ¶ 95 (Mass Hysteria).

d.       Finally, Defendants would then sell their shares at the "pumped" price, leading to a crash in value that would leave unwitting investors with losses. Comp. ¶¶ 2, 28, 51, 71, 86, 98.

e.       As a result of the schemes in controversy, Thompson received gross proceeds of over $5 million. Comp. ¶¶ 28, 51, 71, 86, 98.

f.       The SEC sought the following relief as to Thompson: an injunction against violating Section 17(b) of the Securities Act [15 U.S.C. sec. 77q(b)], an accounting, disgorgement of ill-gotten gains relating to the five issuers listed above, plus a civil penalty. Notably, certain injunctive relief (injunction as to the other statutory violations and a penny stock bar) is not being sought against Thompson in this action because he is subject to a prior injunction issued in an action brought by the Commission against Thompson and others in the Southern District of Florida (the "Florida Action") *SEC v. Recycle Tech, Inc., Ryan Gonzalez, OTC Solutions LLC, Anthony Thompson, Pudong LLC and Jay Fung*, civ. no. 12-21656 (JAL), United States District Court, Southern District of Florida (the "Florida Action"). The Amended Complaint in that litigation is attached to this Declaration as Exhibit B ("Florida Action Am. Comp.").

g.       Prior to the commencement of this action, the New York Office of the SEC conducted an investigation into Thompson's conduct relating to the five issuers in question. During the investigation of this matter, Thompson refused to answer questions at his investigative testimony, asserting his 5th amendment right to decline to answer. A copy of that testimony transcript is attached as Exhibit D.

**The Florida Action.**

4

h.      The Florida Action involved a different issuer, Recycle Tech, Inc. ("Recycle Tech"), different parties, and sought different relief from Thompson. The Florida Action also identified persons and entities that "orchestrated, coordinated, and funded" the scheme at issue, relating to the shares of Recycle Tech, Inc., a microcap issuer. Florida Action Am. Comp. ¶ 1.

i.      The Florida Action also identified persons and entities that "orchestrated, coordinated, and funded" the scheme at issue, relating to the shares of Recycle Tech a microcap issuer. Florida Action Am. Comp. ¶ 1. Thompson was alleged to have participated in that scheme. *Id*. ¶ 4.

j.      Thompson moved to dismiss the Florida Action on certain grounds, including relying on some of the same arguments asserted herein. The Court denied the motion to dismiss certain claims, holding at 13-14 that:

> The Court  finds that  the Amended Complaint sufficiently identifies misrepresentations and omissions by stating that Defendants Thompson, OTC, Fung, and Pudong all recommended that investors purchase Recycle Tech stock in their newsletters while failing to disclose their intention to sell that stock on that same day. (See Am. Compl. ¶¶ 68, 70, 71, 74.) While the newsletters stated that Defendants "may sell part or all" of its Recycle Tech stock, they failed to disclose that they were definitively selling Recycle Tech shares immediately after issuing the newsletters promoting the stock. (See id. ¶¶ 71, 72, 74, 75.)

k.      A copy of that Decision is attached hereto as Exhibit E.

l.      That Decision also addressed Thompson's claim that he had no duty of disclosure towards newsletter subscribers. The court in the Florida Action held to the contrary, on the grounds that a scalper, *i.e.,* one who acquires securities, touts them, and profits from  selling into the demand created by his touting, automatically assumes such a duty:

> "[A] person who intends to engage in scalping assumes a duty to disclose his interest in the targeted stock." *SEC v. Park*, 99 F. Supp. 2d 889, 900 (N.D. Ill. 2000); *see also Zweig v. Hearst Corp.*, 594 F.2d 1261, 1268 (9th Cir. 1979) (holding that newspaper columnist who scalped stocks he promoted in his columns was under a duty to disclose under Section 10(b) and Rule 10b-5 "when,

with knowledge of the stock's market and an intent to gain personally, he encouraged purchases of the securities in the market"). Here, as in *Park*, the SEC is alleging that Defendants engaged in scalping. As such, "the alleged facts may show that Defendants . . . may have assumed a duty to disclose their scalping, [and] the SEC has [therefore] properly alleged its claims based on Defendants omission." *Park*, 99 F. Supp. 2d at 900.

Ex. E at 15-16.

### The New York Criminal Action

m.      Thompson has also been charged by the New York District Attorney with various criminal violations, including the Martin Act, in the proceeding entitled *People of the State of New York v. Thompson, et al.,* Ind. No. 3853/14 (the "NY Criminal Proceeding.")  A copy of the charging instrument in that case is attached hereto as Exhibit C.   Judge Conviser recently dismissed certain charges, leaving Martin Act and Scheme to Defraud counts remaining against Thompson relating to the issuers listed previously, plus Hydrogenetics, Hynergy Holdings, and SunPeaks Ventures.

n.      The undersigned has been advised by the New York County District Attorney's office that trial in the NY Criminal Proceeding is currently scheduled for January 17, 2017.

### Settlement Discussions in this Case

o.      Prior to the commencement of this action, Thompson and the SEC engaged in settlement discussions. As is common in such discussions with the SEC, the proposals are not bilateral in the nature of the obligations set out. They contain agreements only by Thompson to certain terms, and are subject to approval by the SEC hierarchy, including the full Commission.

p.      Notably, the only party that signs to signal assent is Thompson, and unlike many agreements in entirely private litigations only one party has a signature block to indicate assent to the terms.

q.      As Thompson concedes, he was advised in August of 2014 that the settlement had not been approved by senior management at the Division and consequently, would not be submitted to the Commission for review.

r.      As Thompson notes, his attorneys then had telephonic and in-person meetings with Andrew Ceresney, the head of the Commission's Division of Enforcement.  Mr. Ceresney advised counsel for Thompson that no Division settlement recommendation was final until he approved it, and that he was not doing so in this matter.

s.      Thus, Thompson was fully informed that Division staff would not recommend any settlement until the most senior manager at the Division assented to that course of action – which he did not do.

t.      It is well-established that no agreement with the SEC is final until the Commission approves, and the Commission may require additional modifications.

u.      Moreover, in this case the staff attorneys working on the matter never made any representations that they enjoyed the power to bind the SEC to settlements absent the approval of the Director of the Division of Enforcement.  Thompson refers to my letter of January 7, 2014 to support his claim that I represented that I had authority to bind the entire Division of Enforcement including the entire chain of command in NYRO and the Division's Senior Staff. What Thompson fails to mention in this context is that Brent Baker, the lawyer representing Thompson in his dealings with the Commission in both the Florida Action and the investigation by the NYRO, was a lawyer at the Commission and in private practice regularly represents clients in investigations and enforcement proceedings brought by the Commission. Mr. Baker is undoubtedly familiar with the Commission's approval process and knows that settlement recommendations by staff attorneys are subject to many layers of vetting and approval before

any recommendation is presented to the Commission, and that any recommendation can be rejected before it reaches the Commission. The notion that he took the language in my January 7, 2014 letter to mean that I was representing that I could and was binding the entire Division of Enforcement is incredible.

### Res Judicata Is Inapplicable

v.      This action relates to different issuers than at controversy in the Florida Action. It implicates different misrepresentations and omissions.

w.      Furthermore, this action describes Thompson as playing a leading role, as opposed to merely playing a supporting role in furthering a fraudulent scheme planned by others.

x.      Additionally, Thompson's own conduct in the settlement of the Florida Action belies his newly-concocted claims here. Thompson voluntarily and fully participated in the attempted settlement of this action over a period of months, without ever claiming that there was some *res judicata* bar due to his prior settlement. He could have argued in his settlement of the Florida Action that it should have included every issuer with which he had some involvement, but he did not.

y.      The two actions were investigated separately, by separate offices and separate staff, and at all times Thompson was an active participant in both investigations.  Further, Defendant was represented in each negotiation by counsel familiar with Commission settlements and settlement procedures.  Thompson knew full well that each matter had to be resolved separately, on its own terms.

z.      Consequently, when settlement discussions commenced, separately in each case, at no time did Thompson seek to condition the settlement of one case on the settlement of the

8

other. All of the settlement negotiations in each action were handled separately, by separate offices, and by separate staff from each of those offices.

      aa.    Thompson was well aware throughout that even if he arrived at separate proposed settlements, the Commission might reject one or the other, putting him in precisely the situation he is now in.

      bb.    Furthermore, the settlement of the Florida Action, resulting in a consent judgment that was entered while negotiations in this case were still ongoing, contains a specific provision that the judgment therein resolved only that case, and only the specific claims asserted in that action.  Thompson's Consent states, at paragraph 12: "Consistent with 17 C.F.R. 202.5(f), this Consent resolves only the claims asserted against Thompson in this civil proceeding." Baker Declaration, Exhibit 21.

      cc.    Given all that, Thompson could not have been under the illusion that the two cases were married together, or that settlement of one action was contingent on the other. Additionally, the bulk of the negotiations in this action occurred after Thompson had submitted his Consent to the settlement in the Florida Action.

      dd.    Consequently, the intent of the parties was clear, and there could be no reasonable way in which Thompson could believe that there was some kind of package deal wherein if one settlement did not happen, the case could not proceed. There is no evidentiary basis in the summary judgment record to the contrary

### Estoppel Against the Government is Entirely Inappropriate

      ee.    At no time did I or to my knowledge, Michael Osnato or any other staff attorney at the SEC conduct ourselves as if we possessed the authority to bind the SEC. Nor did we ever communicate to Thompson that we were doing so.

ff.     Not only did we never advise Thompson that we had the authority to bind the SEC to a settlement, we never explicitly represented that we had the authority to bind the Division of Enforcement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 20, 2016.

Peter Pizzani