UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

        -v-

ANTHONY J. THOMPSON, JR., JAY FUNG,
and ERIC VAN NGUYEN,

             Defendants,

        -and-

JOHN BABIKIAN and KENDALL THOMPSON,

         Relief Defendants,

NEW YORK COUNTY DISTRICT ATTORNEY,

           Intervenor.

------------------------------------------------------------ X

14-cv-9126 (KBF)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  March 2, 2017

KATHERINE B. FORREST, District Judge:

      This is an enforcement action brought by the New York office of the

Securities and Exchange Commission ("SEC") against defendants Anthony J.

Thompson Jr., Jay Fung and Eric Van Nguyen—three alleged penny stock

promoters—and three relief defendants.  (ECF No. 1 ("Compl.") ¶¶ 9-13.)  The SEC

alleges that, from November 2009 to September 2010, defendants conducted five

penny stock "pump-and-dump"/"scalping" schemes in which they touted certain

securities to the investing public without disclosing the extent of their financial

stakes in those securities.  The SEC alleges that, in perpetrating these schemes, the

defendants violated several provisions of the securities laws: Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, as well as Sections 17(a) and 17(b) of the Securities Act of 1933 ("Securities Act").

The SEC instituted this action after its Florida office prosecuted Thompson and other defendants for securities violations in connection with a penny stock scheme involving a separate issuer, and after the New York office unsuccessfully engaged in settlement negotiations with Thompson. This case is in the early stages. Discovery has been stayed until the earlier of August 11, 2017 or the resolution of a parallel criminal proceeding that Thompson is currently defending in New York state court. (ECF No. 39.)

Now before the Court is Thompson's motion for summary judgment. (ECF No. 42.) Thompson originally filed the motion as a motion to dismiss; the Court converted it to one for summary judgment because Thompson cited materials outside the pleadings. (ECF No. 47.) Thompson advances three arguments in support of his motion. First, he asserts that this action is barred in its entirety by the Florida Action under principles of res judicata. Second, he argues that the SEC should be obligated to settle the charges against him under principles of New York contract law or promissory estoppel. Third, Thompson submits that the SEC has failed to allege securities laws violations against him as a matter of law.

For the reasons set forth below, Thompson's motion for summary judgment (ECF No. 42) is DENIED.

I.      BACKGROUND[1]

    A.      <u>The Florida Action</u>

From 2009 to 2010, Thompson was the managing director of OTC Solutions LLC ("OTC Solutions"), a now-defunct Maryland company that published and disseminated newsletters touting penny stock companies.  (<u>See</u> Plaintiff's Responses to Defendant Anthony J. Thompson's Local Rule 56.1 Statement of Undisputed Facts ("Pl.'s 56.1", ECF No. 55) ¶¶ 1-2; <u>see also</u> Compl. ¶ 9.)

On May 2, 2012, the SEC filed an enforcement action in the United States District Court for the Southern District of Florida against Recycle Tech., Inc. ("Recycle Tech."), Kevin Sepe, Ronny J. Halperin, Ryan Gonzalez, Thompson, OTC Solutions, Pudong LLC ("Pudong"), Jay Fung and David Rees (the "Florida Action"). (Pl.'s 56.1 ¶ 9; <u>see also</u> <u>S.E.C. v. Recycle Tech, Inc. et al.</u>, No. 12-cv-21656-JAL (S.D. Fl.), ECF No. 1.)  The SEC filed an amended complaint on August 17, 2012 in which Sepe, Halperin and Rees were no longer named defendants.  (Declaration of Peter Pizzani, dated October 20, 2016 ("Pizzani Decl.", ECF No. 54), Ex. B ("Florida Compl.").)  The SEC alleged that, from January through March 2010, defendants— along with Sepe, Halperin and Rees—perpetrated a penny stock pump-and-dump scheme involving the stock of a single issuer, defendant Recycle Tech.  (Pl.'s 56.1 ¶ 9; <u>see also</u> Florida Compl. ¶ 1.)  The complaint portrays Sepe, Gonzalez and Halperin as the architects of the scheme.  (<u>See, e.g.</u>, Florida Compl. ¶¶ 1-2.)  The SEC alleged that these three individuals set up a series of transactions through

---

[1] The facts set forth herein are undisputed unless otherwise noted.

which their private sham company—developed for purposes of the scheme—
acquired control of and merged into Recycle Tech, a publicly traded penny stock
company.  (Id. ¶¶ 22-52.).  Sepe and Gonzalez then allegedly "pumped" Recycle
Tech's stock by issuing false and misleading press releases on behalf of the
company.  (Id. ¶¶ 53-64.)  The SEC alleged that Sepe enlisted Thompson to
participate in the scheme by touting Recycle Tech stock in OTC Solution's
newsletters.  (Id. ¶¶ 65-68.)  In exchange, Sepe allegedly arranged for Recycle Tech
to issue Thompson 2.325 million shares of Recycle Tech stock.  (Id.)  The SEC
further alleged that Thompson failed to adequately disclose his (and his companies')
financial holdings in, and intent to sell, Recycle Tech stock.  (Id.)  The SEC made
similar allegations against Fung, who also allegedly received 2.325 million shares of
Recycle Tech stock for touting the company in Pudong's newsletters.  (Id.)

        As a result of these allegations, the SEC claimed that Thompson violated
Sections 5(a), 5(c), 17(a) and 17(b) of the Securities Act, as well as Section 10(b) of
the Exchange Act and Rule 10b-5.  (Id. ¶ 7.)  By way of relief, the SEC sought a
declaratory judgment that Thompson had violated these laws, a permanent
injunction barring him from violating them in the future, disgorgement of ill-gotten
gains, civil monetary penalties and a "penny stock bar" prohibiting him from
participating in any offering of penny stock.  (Id. at 26-28.)

        In July 2013, while the Florida Action was pending, the SEC's New York
office began investigating Thompson, OTC Solutions, Fung and Pudong for conduct
involving issuers other than Recycle Tech.  (See Declaration of Brent Baker, dated

August 15, 2016 ("Baker Decl.", ECF No. 44), Ex. 12; see also Pl.'s 56.1 ¶ 13.)  Some
discovery in the Florida Action concerned these other issuers.  (See Pl.'s 56.1 ¶¶ 10-
12.)  On October 7, 2013, for instance, the SEC served interrogatories requesting
that Thompson and OTC Solutions identify all issuers that they promoted through
email newsletters from January 1, 2009 through December 31, 2010.  (Pl.'s 56.1 ¶
10; Baker Decl., Exs. 7, 8.)  Also on October 7, 2013, the SEC requested that
Thompson and OTC Solutions produce all of their email newsletters from January
1, 2009 through December 31, 2010, and all email newsletters, regardless of time
period, concerning the issuers Mass Hysteria Entertainment Company, Inc. ("Mass
Hysteria"), Blue Gem Enterprise, Inc. ("Blue Gem") and Lyric Jeans, Inc. ("Lyric
Jeans").  (Pl.'s 56.1 ¶ 11; Baker Decl., Exs. 9, 10.)  In addition, during Thompson's
deposition in the Florida Action, the SEC asked questions relating to Blast
Applications Inc. ("Blast"), Smart Holdings, Inc. ("Smart Holdings"), Blue Gem and
Lyric Jeans.  (Pl.'s 56.1 ¶ 12; Baker Decl., Exs. 6, 11.)

On October 31, 2013, the parties appeared at a discovery hearing before the
Honorable John J. O'Sullivan to address whether the SEC's discovery requests
about issuers other than Recycle Tech. were relevant to—and hence discoverable
in—the Florida Action.  (See Pl.'s 56.1 ¶ 14; Baker Decl., Exs. 14, 15.)  Thompson
and OTC Solutions argued that such discovery was inappropriate because it
exceeded the scope of the Florida Action and overlapped with matters then under
investigation by the SEC's New York office.  (See Baker Decl, Ex. 14 at 53:8-16
(stating that "the SEC seems to want to expand the Recycle Tech case to include the

same things that the New York office is currently investigating" and "the SEC trying to get information on two separate fronts is inappropriate."; see also Pl.'s 56.1 ¶ 14.)  The SEC argued that information about other issuers was necessary to establish that the defendants' securities violations were ongoing and continuing, a factor required for the injunctive relief sought in the Florida Action.  (See Baker Decl., Ex. 14 at 54:21-55:5; see also id. at 56:11-57:12.)  Judge O'Sullivan ruled in favor of the SEC.  He found that the requested documents were "relevant to this lawsuit, even though they don't involve the exact claim in this lawsuit" and ordered their production.  (Baker Decl., Ex. 14 at 57:13-22; see also id., Ex. 15 (written order following hearing stating "the documents discussed during the hearing regarding the New York SEC investigation are relevant and discoverable."); Pl.'s 56.1 ¶ 16 (same.)  He also ordered that Thompson and OTC Solutions respond to the SEC's interrogatories about issuers other than Recycle Tech.  (Baker Decl., Ex. 15.)

Thompson and OTC Solutions agreed with the SEC to settle the Florida Action in early 2014.  (See Pl.'s 56.1 ¶ 20; see also Baker Decl., Exs. 21-24.)  On February 14, 2014, the Court entered final judgment against Thompson, which effected the settlement terms (Baker Decl., Ex. 23) to which Thompson had consented (id., Ex. 21).  (See also Pl.'s 56.1 ¶ 23.)  Pursuant to that consent judgment, Thompson agreed to disgorge $349,504.61 of ill-gotten gains resulting from the Recycle Tech scheme and $23,735.15 in prejudgment interest, and to pay $120,000 in civil monetary damages.  (Baker Decl., Ex. 23 at 70-71; Pl.'s 56.1 ¶¶ 22-23.)  The Court also entered a penny stock bar against Thompson (Baker Decl., Ex.

6

23 at 73) and enjoined him from violating Sections 5(a), 5(c) and 17(a) of the

Securities Act, as well as Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder (id. at 68-70)—all of the laws he was charged with

violating except Section 17(b) of the Securities Act.  (See also Pl's. 56.1 ¶¶ 22-23.)

In paragraph 8 of the consent to final judgment, Thompson represented that he

entered into the consent voluntarily and that:

> no threats, offers, promises, or inducements of any kind have been made by
> the Commission or any member, officer, employee, agent, or representative of
> the Commission to induce Thompson or anyone acting on his behalf to enter
> into this Consent.

(Baker Decl., Ex. 21 ¶ 8.)  In paragraph 12 of the consent, Thompson further agreed

that the consent judgment "resolves only the claims asserted against Thompson in

this civil proceeding."  (Id. ¶ 12 (emphasis added).)[2]

## B.   The New York Investigation

As described above, in July 2013, while the Florida Action was pending, the

SEC's New York office began investigating Thompson, OTC Solutions, Fung and

Pudong for securities violations relating to penny stock issuers other than Recycle

Tech, the subject issuer in the Florida Action.  (See Baker Decl., Ex. 12; see also

Pl.'s 56.1 ¶ 13.)  Thompson's submissions in connection with the instant motion

extensively set forth the details of the New York investigation and ensuing

---

[2] The full text of paragraph 12 of the consent reads, "Consistent with 17 C.F.R. § 202.5(f), this
Consent resolves only the claims asserted against Thompson in the civil proceeding."  (Id. (emphasis
added).)  17 C.F.R. § 202.5(f) provides that an individual who consents to settle an SEC enforcement
action "does so solely for the purpose of resolving the claims against him in that investigative, civil,
or administrative matter and not for the purpose of resolving any criminal charges that have been,
or might be, brought against him.".  17 C.F.R. § 202.5(f).  Although 17 C.F.R. § 202.5(f) relates
exclusively to successive criminal prosecutions, the reference to 17 C.F.R. § 202.5(f) in paragraph 12
of the consent does not limit the scope of that provision; rather, it merely reflects that paragraph 12
is "consistent with" 17 C.F.R. § 202.5(f).

settlement negotiations that preceded the filing of this lawsuit. (See, e.g., Pl.'s 56.1 ¶¶ 24-44; ECF No. 43 at 21-26.) Virtually all of these facts are proffered in support of Thompson's breach of contract and promissory estoppel arguments. Given that this action is in the beginning stages, and that the Court finds summary judgment inappropriate on these bases at this time (and, as presented, the defenses raise triable issues in all events), the Court does not believe it necessary to wade into the particulars of these facts. For purposes of resolving this motion, the Court notes that, from December 2013 to August 2014, Thompson's counsel engaged in settlement discussions with various Division of Enforcement ("DOE") attorneys that culminated in Thompson executing an Offer of Settlement and escrowing settlement funds pursuant to that document. (See, e.g., Pl.'s 56.1 ¶¶ 24-44; Baker Decl., Exs. 25-32.) The parties dispute whether the DOE attorneys had authority to bind the DOE to recommend the proposed settlement to the full Commission. Thompson submits that DOE attorneys represented that the proposed settlement would be recommended to the full Commission for approval, but that this never came to fruition. (See, e.g., Pl.'s 56.1 ¶¶ 34-44; ECF No. 43 at 23-26.) Both parties agree that, at some point during the negotiations, then-Director of the DOE, Andrew Ceresney, informed Thompson's counsel that any agreement by DOE staff would be final and binding only if approved by him personally, and that the DOE had no obligation to recommend the Offer of Settlement to the Commission because he had not approved it. (Pl.'s 56.1 ¶ 44.)

C.    The Instant Action

On November 17, 2014, the SEC commenced the instant action against defendants Thompson, Fung and Van Nguyen and relief defendants Babikian and Thompson.  (Id. ¶ 45; see also Compl.)  The SEC's allegations revolve around five alleged "pump-and-dump"/"scalping" schemes carried out from November 2009 through September 2010 to inflate the price of penny stocks issued by five issuers: Blast, Smart Holdings, Blue Gem, Lyric Jeans and Mass Hysteria.  (See Compl. ¶ 1.)  The complaint does not mention Recycle Tech, the issuer in the Florida Action, or Sepe, Gonzalez and Halperin, the organizers of the scheme alleged in that case.

The SEC alleges, inter alia, that Thompson, acting through OTC Solutions and other entities he controlled, issued misleading newsletters that touted these stocks' value without disclosing that he had, and intended to sell, significant holdings thereof.  (Id. ¶¶ 1-4.)  Although many of the newsletters contained disclaimers listing that Thompson's entities owned a particular amount of stock in the touted companies, the SEC alleges that these amounts understated the true extent of Thompson's holdings.  (E.g., ¶¶ 24, 44, 67, 82, 93.)  The SEC makes similar allegations against Fung and Van Nguyen, who allegedly caused entities they controlled to issue similarly misleading newsletters.  (Id. ¶¶ 1-4.)[3]

As a result of this alleged conduct, the SEC claims that Thompson violated Sections 17(a) and 17(b) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  (Id. ¶¶ 100-10.)  The SEC seeks a permanent injunction

---

[3] The Court refers the reader to the allegations set forth in the Complaint for a full recitation of the facts alleged by the SEC.

restraining Thompson from violating Section 17(b), and orders requiring him to provide sworn accountings of his profits and assets, to disgorge any ill-gotten gains arising from the five alleged schemes and to pay civil monetary penalties.  (Id. at 27-29.)

This action runs parallel to criminal proceedings instituted by the New York County District Attorney against Thompson and others in New York state court. (ECF No. 6; see also ECF No. 63 (letter dated February 14, 2017 noting that parallel criminal proceedings remain pending).)  On January 23, 2015, upon hearing from the parties and the New York County District Attorney, the Court stayed this action for a period of one year, or resolution of the criminal proceeding, whichever occurred earlier.  (ECF No. 22.)  On January 28, 2016, the Court extended the stay by six months.  (ECF No. 35.)  On July 11, 2016, the Court extended the stay of discovery for a period of one year or resolution of the criminal proceeding, whichever is earlier, but otherwise lifted the stay. (ECF No. 39.)

On August 15, 2016, Thompson filed the instant motion.  (ECF No. 42.) Although Thompson styled it as a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), his supporting brief cited the evidentiary record.  (See ECF No. 43; see also Baker Decl. (attaching 34 exhibits).)  Accordingly, on August 30, 2016, the Court converted Thompson's motion to dismiss to a motion for summary judgment, provided Thompson with an opportunity to submit additional materials and extended the timeline for the SEC to oppose the motion. (ECF No. 47.)  The motion came fully briefed on January 27, 2017.  (ECF No. 58.)

II.     RELEVANT LEGAL PRINCIPLES

     A.     <u>Summary Judgment</u>

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law".  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact".  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.  <u>Id.</u> at 322-23.

In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor".  <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 740 (2d Cir. 2010) (citing <u>LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.</u>, 424 F.3d 195, 205 (2d Cir. 2005)).  Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial.  <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist".  <u>Hicks v. Baines</u>, 593 F.3d 159,

166 (2d Cir. 2010) (internal quotation marks, citations and alterations omitted).  In addition, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment".  Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks, citation and alterations omitted).

    B.    Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In other words, the complaint must allege "'enough facts to state a claim to relief that is plausible on its face.'" Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).

In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id. (citing Twombly, 550 U.S. at 555). The Court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).  A plaintiff may plead facts alleged upon

12

information and belief "where the facts are peculiarly within the possession and control of the defendant."  Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted).  But, if the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate.  Twombly, 550 U.S. at 570; see also Starr, 592 F.3d at 321 (quoting Iqbal, 556 U.S. at 679).

In deciding a motion to dismiss under Rule 12(b)(6), the Court may consider documents referenced in the complaint or relied upon in framing the complaint.  See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint, the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.") (internal quotation marks, alteration and citation omitted).

C.    Res Judicata

"'Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'"  TechnoMarine SA v. Giftports,

13

Inc., 758 F.3d 493, 499 (2d Cir. 2014) (quoting St. Pierre v. Dyer, 208 F.3d 394, 399 (2d Cir. 2000)).  The doctrines applies to final judgments entered by courts and, in some instances, finalized settlements.  Greenberg v. Bd. of Governors of Fed. Reserve Sys., 968 F.2d 164, 168 (2d Cir. 1992).

Res judicata is an affirmative defense.  TechnoMarine SA, 758 F.3d at 499. To assert the defense, "a party must show that (1) the previous action involved [a final] adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action."  Id. (quoting Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000)) (alterations omitted).  "The burden is on the party seeking to invoke res judicata to prove that the doctrine bars the second action."  Computer Assocs. Int'l, Inc. v. Altai, Inc., 126 F.3d 365, 369 (2d Cir. 1997) (citation omitted).

The third prong requires courts to assess the similarity of the claims asserted in the prior and instant actions.  Courts must first assess whether "'. . . the second suit involves the same 'claim'—or 'nucleus of operative fact'—as the first suit.'" Waldman v. Vill. of Kiryas Joel, 207 F.3d 105, 108 (2d Cir. 2000) (quoting Interoceanica Corp. v. Sound Pilots, Inc., 107 F.3d 86, 90 (2d Cir. 1997)).  "Whether a claim that was not raised in the previous action could have been raised therein 'depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first.'"

TechnoMarine SA, 758 F.3d at 499 (quoting Woods v. Dunlop Tire Corp., 972 F.2d
36, 38 (2d Cir. 1992)); see also Interoceanica Corp., 107 F.3d at 90 (quoting Nat'l
Labor Relations Bd. v. United Techs. Corp., 706 F.2d 1254, 1260 (2d Cir. 1983)).
"To determine whether two actions arise from the same transaction or claim, we
consider 'whether the underlying facts are related in time, space, origin, or
motivation, whether they form a convenient trial unit, and whether their treatment
as a unit conforms to the parties' expectations or business understanding or usage.'"
TechnoMarine SA, 758 F.3d at 499 (quoting Pike v. Freeman, 266 F.3d 78, 91 (2d
Cir. 2001)); see also Waldman, 207 F.3d at 108 (quoting Interoceanica Corp., 107
F.3d at 90).  "[T]he fact that both suits involved essentially the same course of
wrongful conduct is not decisive; nor is it dispositive that the two proceedings
involved the same parties, similar or overlapping facts, and similar legal issues."
Interoceanica Corp., 107 F.3d at 91; S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450,
1463 (2d Cir. 1996) (internal citations omitted); see also Proctor v. LeClaire, 715
F.3d 402, 412 (2d Cir. 2013) ("The fact that several operative facts may be common
to successive actions between the same parties does not mean that a judgment in
the first will always preclude litigation of the second.") (citing Interoceanica Corp.,
107 F.3d at 91).

> D.   Settlement Negotiations with the SEC

Although courts ordinarily uphold settlements where the attorney had
"apparent authority to settle . . ., and the opposing counsel has no reason to doubt
that authority",  Fennell v. TLB Kent Co., 865 F.2d 498, 502 (2d Cir. 1989) (citing

Int'l Telemeter Corp. v. Teleprompter Corp., 592 F.2d 49, 55 (2d Cir. 1979)),[4] the doctrine of apparent authority does not apply to government attorneys, see Doe v. Civiletti, 635 F.2d 88, 96 (2d Cir. 1980) ("[I]t is axiomatic that the United States is not bound by the unauthorized acts of its agents."); Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947) ("[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."); see also United States v. Zenith-Godley Co., 180 F. Supp. 611, 615-16 (S.D.N.Y. 1960), aff'd, 295 F.2d 634 (2d Cir. 1961) (citing Merrill, 332 U.S. at 384); Berns & Koppstein, Inc. v. Commodity Credit Corp., 271 F. Supp. 433, 436 (S.D.N.Y. 1967) (citing Zenith-Godley Co., 180 F. Supp. 611); Littlejohn v. Washington Metro. Area Transit Auth., No. 90-1724 (RCL), 1992 WL 122755, at *2 (D.D.C. May 28, 1992) (citing United States v. Dist. of Columbia, 669 F.2d 738, 748 n.13 (D.C. Cir. 1981)).

Thus, agreements with the SEC, and indeed any governmental agency, are binding only if the staff attorneys that negotiated the agreement followed proper procedures, i.e., had actual authority to bind the government. The policies and procedures governing the SEC's Division of Enforcement are set forth in SEC regulations, 17 C.F.R. § 200 et seq., and an internal but publicly available manual

---

[4] "Apparent authority is 'the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.'" Fennell, 865 F.2d at 502 (quoting Restatement (Second) of Agency § 8 (1958)) (emphasis omitted). "[I]n order to create apparent authority, the principal must manifest to the third party that he 'consents to have the act done on his behalf by the person purporting to act for him.'" Id. (quoting Restatement (Second) of Agency § 8) (emphasis omitted). Thus, an attorney has apparent authority to settle a case only if the client makes direct representations to that effect to the opposing party's counsel. Id. (holding that plaintiff's counsel had no apparent authority to settle case because plaintiff "made no manifestations to defendants' counsel that [his attorneys] were authorized to settle the case.").

entitled the SEC "Enforcement Manual", <u>see</u> S.E.C. Enforcement Manual § 1.1, <u>available at</u> https://www.sec.gov/divisions/enforce/enforcementmanual.pdf (last visited March 2, 2017).

The DOE is responsible for investigating potential violations of the federal securities laws and conducting the Commission's enforcement activities.  <u>See</u> 17 C.F.R. § 200.19b; S.E.C. Enforcement Manual § 1.4.1.  The Division consists of a staff of attorneys, among others, headed by a Director.  While the Commission has delegated certain authority to the Director of the DOE to carry out these duties, settlements require approval by the Commission.[5]  <u>See</u> 17 C.F.R. §§ 200.19b, 200.30-4; S.E.C. Enforcement Manual § 2.5.1.  (<u>See also</u> Pizzani Decl. ¶ t.)  To obtain approval to enter into a settlement, the Division submits an "action memorandum" for the Commission's review "that sets forth a Division recommendation and provides a comprehensive explanation of the recommendation's factual and legal foundation."  S.E.C. Enforcement Manual § 2.5.1.  The Commission then considers and votes on the Division's recommendation.  <u>Id.</u> § 2.5.2.

E.    <u>Section 17(b)</u>

Section 17(b) of the Securities Act targets "scalping", a practice in which the owner of a security recommends it for investment and then sells it at a profit.  <u>See</u> <u>Aaron v. S.E.C.</u>, 446 U.S. 680, 692 (1980) (defining "scalping" in context of Investment Advisers Act of 1940); <u>S.E.C. v. Huttoe</u>, No. 96-2543 (GK), 1998 WL

---

[5] The term "Commission" refers to the five presidential appointees, or commissioners, who head the agency.  <u>See</u> 17 C.F.R. § 200.10 ("The Commission is composed of five members . . . appointed by the President, with the advice and consent of the Senate, for 5-year terms").

34078092, at *7 (D.D.C. Sept. 14, 1998) (defining "scalping" where defendant was charged with violating Section 17(b), among other securities laws).  Section 17(b) "was designed to protect the public from publications that 'purport to give an unbiased opinion but which opinions are in reality being paid for.'"  S.E.C. v. Gorsek, 222 F. Supp. 2d 1099, 1105 (C.D. Ill. 2001) (quoting United States v. Amick, 439 F.2d 351, 365 (7th Cir. 1971)).

> To that end, Section 17(b) makes it unlawful to:
>
> publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

15 U.S.C. § 77q(b); see also S.E.C. v. Monarch Funding Corp., No. 85-cv-7072 (LBS), 1996 WL 348209, at **5-6 (S.D.N.Y. June 24, 1996).  Thus, Section 17(b) does not impose a ban; it regulates through disclosure.  Scalping is permitted, provided the individual with the vested interest in the stock discloses the extent of his financial stake in the subject securities.

F.    Section 10(b), Rule 10b-5 and Section 17(a)

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit fraud in connection with the purchase or sale of securities.  See 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5.  These provisions prohibit both material misstatements and omissions, see 17 C.F.R. § 240.10b-5(b), and deceptive conduct, see 17 C.F.R. § 240.10b-5(a), (c), in connection with the purchase or sale of securities.  While Rule 10b-5(b) targets misleading disclosures, Rules 10b-5(a) and (c) target deceptive

18

conduct.  S.E.C. v. Lee, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010); see also Wilson v. Merrill Lynch & Co., Inc., 671 F.3d 120, 129 (2d Cir. 2011) ("Section 10(b), in proscribing the use of a 'manipulative or deceptive device or contrivance,' prohibits not only material misstatements but also manipulative acts.'") (quoting ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007)); United States v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008) ("'Conduct itself can be deceptive,' and so liability under § 10(b) or Rule 10b-5 does not require 'a specific oral or written statement.'") (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 158 (2008)).

To establish a Rule 10b-5(b) disclosure violation, the SEC must prove that the defendant (1) made one or more misstatements of material fact, or omitted to state one or more material facts that the defendants had a duty to disclose; (2) with scienter; (3) in connection with the purchase or sale of securities.  See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (setting forth requisite elements for private plaintiffs); In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998) (same); see also Lee, 720 F. Supp. 2d at 324-25 (stating that, unlike private litigants, the SEC is not required to prove investor reliance, loss causation or damages).  To establish a deceptive conduct claim under Rules 10b-5(a) or (c), the SEC must allege that the defendant (1) committed a manipulative or deceptive act; (2) in furtherance of the alleged scheme to defraud; and (3) with scienter.  Lee, 720 F. Supp. 2d at 325 (quoting In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d

319, 336 (S.D.N.Y. 2004)).  A "manipulative or deceptive act" is "some act that gives the victim a false impression."  <u>Finnerty</u>, 533 F.3d at 148.

Section 17(a)(1) of the Securities Act makes it unlawful to "employ any device, scheme, or artifice to defraud" in the offer or sale of securities.  15 U.S.C. § 77q(a)(1).  "Essentially the same elements are required under Section 17(a)(1)" as under Section 10(b) and Rule 10b-5, except that Section 17(a)(1) requires proof of a connection with the "offer or sale" of securities, instead of the "purchase or sale" of securities.  <u>S.E.C. v. Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir. 1999).

Section 17(a)(3) of the Securities Act prohibits defendant from engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a)(3).  Unlike for Section 10(b) and Section 17(a)(1), "[s]cienter is not required to prove a defendant violated [Section 17(a)(3)].  A showing of negligence is sufficient."  <u>S.E.C. v. Ginder</u>, 752 F.3d 569, 574 (2d Cir. 2014) (internal citations omitted); <u>see also</u> <u>Aaron</u>, 446 U.S. at 701-02.  "To properly state a claim under Section 17(a)(3), the necessary elements are the same as those for Section 10(b) and 17(a)(1), although plaintiff need not allege or prove scienter."  <u>S.E.C. v. Glantz</u>, No. 94-cv-5737 (CSH), 1995 WL 562180, at *5 (S.D.N.Y. Sept. 20, 1995) (citations omitted); <u>see also</u> <u>S.E.C. v. Norton</u>, No. 95-cv-4451 (SHS), 1997 WL 611556, at *3 (S.D.N.Y. Oct. 3, 1997) (citations omitted).

Section 10(b), Rule 10b-5 and Section 17(a) all sound in fraud.  Accordingly, to state a violation of these provisions, the plaintiff must state "the circumstances constituting fraud or mistake" with "particularity".  Fed. R. Civ. P. 9(b); <u>see also</u>

20

<u>Lee</u>, 720 F. Supp. 2d at 325 ("In order to state a claim under Sections 17(a) of the Securities Act [and] 10(b) of the Exchange Act . . . , the heightened pleading standard of Federal Rule of Civil Procedure 9(b) must be satisfied.").

III.    DISCUSSION

Thompson asserts that the SEC should be barred from bringing this action under <u>res judicata</u>, that the SEC should be compelled to settle the action pursuant to Thompson's Offer of Settlement and that the SEC's claims fail on the merits.  The Court denies each of Thompson's applications.

A.    <u>Res Judicata</u>

Thompson first argues that <u>res judicata</u> bars the claims asserted in this action because they were already finally adjudicated in the Florida Action.  (<u>See</u> ECF No. 43 at 27-33.)  The Court disagrees.  While the first two elements of the <u>res judicata</u> test are satisfied here,[6] the third element is not.  That is, the claims asserted by the SEC in this case were not, and could not have been, raised in the Florida Action, <u>see</u> <u>TechnoMarine SA</u>, 758 F.3d at 499, because the instant action does not involve the same "claim" or "nucleus of operative fact" as the allegations in that suit, <u>see</u> <u>Waldman</u>, 207 F.3d at 108.

In the Florida Action, the SEC alleged a penny stock "pump-and-dump"/ "scalping" scheme involving a single issuer, Recycle Tech.  (<u>See</u> Florida Compl.)  The

---

[6] The first two elements of the <u>res judicata</u> test are satisfied and not in dispute.  First, the Florida Settlement plainly resolved all claims asserted in that action.  <u>See</u> <u>Greenberg</u>, 968 F.2d at 168 ("Res judicata applies to judgments by courts . . . .  Settlements may also have preclusive effect.") (citations omitted); <u>see also</u> <u>Monahan</u>, 214 F.3d at 285 (noting neither party contested that settlement agreement resolving agency enforcement action was a final adjudication to which <u>res judicata</u> applied).  Second, the SEC is the plaintiff in both actions.

scheme was allegedly run by Sepe, Gonzalez and Halperin.  (<u>Id.</u> ¶¶ 1-2.)  The SEC alleged that, with the help of a legal adviser, these individuals acquired control of Recycle Tech in January 2010 and began issuing misleading press releases touting Recycle Tech stock in mid-February 2010.  (<u>Id.</u> ¶¶ 22-64.)  The SEC further alleged that Thompson (and his company, OTC Solutions) became involved in late February 2010 after the scheme was underway, and only after being approached by Sepe.  (<u>Id.</u> ¶¶ 65-68.)  In settling the Florida Action, Thompson agreed that the judgment resolved only the claims asserted against him in that case. (Baker Decl., Ex. 21 ¶ 12.)

The SEC's allegations in this action differ markedly from those in the Florida Action.  First, the five penny stock schemes alleged here involve issuers not mentioned in the Florida Complaint:  Blast, Smart Holdings, Blue Gem, Lyric Jeans and Mass Hysteria.  Recycle Tech—the only issuer mentioned in the Florida Complaint—appears nowhere in the instant complaint.  Further, although Thompson and Fung are defendants to both suits, the SEC alleges they played far more significant roles here than in the Florida Action.  Whereas in the Florida Action, the SEC alleged that Thompson and Fung were mere participants in the Recycle Tech scheme, here the SEC alleges that Thompson and Fung "conducted" the subject schemes without solicitation or participation by anyone else.  (<u>E.g.</u>, Compl. ¶¶ 1-2.)  Notably, the SEC does not presently allege that Sepe, Halperin and Gonzalez played <u>any</u> part in the five schemes at issue here, let alone the supervisory roles they played in the Recycle Tech scheme.  Indeed, these three

individuals are not mentioned in the instant complaint.  Third, the SEC does not

allege that the five issuers here engaged in any actionable touting activity

themselves, such as by issuing press releases similar to those allegedly issued by

Recycle Tech in the Florida Action.  The touting activity at issue here consists only

of statements made in newsletters disseminated by promotional entities allegedly

controlled by the defendants.

These differences illustrate that the Recycle Tech scheme and the five

schemes alleged here do not form a "connected series of transactions".  See

TechnoMarine SA, 758 F.3d at 499.  Rather, the allegations in this lawsuit are

based on different facts and evidence than the allegations underlying the Florida

Action.  As a result, res judicata does not bar this enforcement action.  See

Interoceanica Corp., 107 F.3d at 91 ("A first judgment will generally have preclusive

effect only where the transaction or connected series of transactions at issue in both

suits is the same, that is where the same evidence is needed to support both claims,

and where the facts essential to the second were present in the first."); First Jersey

Sec., Inc., 101 F.3d at 1464 (citing Second Circuit cases holding that where second

litigation involves different transactions than the first, res judicata does not bar

second lawsuit).

The Court reaches this conclusion even though, as Thompson points out,

there are some significant similarities between the two sets of schemes.  The Court

acknowledges, for instance, that the lawsuits both involve penny stock frauds

carried out before the Florida Action was filed (in 2012) by some of the same

23

individuals, namely Thompson and Fung, and the defendants are charged with

violating the some of the same securities statutes.  These similarities, however, are

insufficient to invoke <u>res judicata</u> here.  While the two lawsuits clearly involve a

similar course of misconduct, some of the same parties, and some overlapping facts

and legal issues, such commonalities are not dispositive.  <u>See</u> <u>Interoceanica Corp.</u>,

107 F.3d at 91; <u>Greenberg</u>, 968 F.2d at 168; <u>Computer Assocs. Int'l, Inc.</u>, 126 F.3d at

369.

      <u>First Jersey Securities</u> is instructive.  <u>See</u> 101 F.3d 1450.  In that case, the

SEC alleged that First Jersey, a broker-dealer, and its CEO engaged in a scheme to

fraudulently induce customers to buy six particular securities at artificially

excessive prices, yielding massive profits for the defendants.  <u>Id.</u> at 1456.

Defendants argued that the action was barred under <u>res judicata</u> by a settled SEC

administrative proceeding brought against First Jersey and a number of its

principals a few years prior.  <u>Id.</u> at 1462.  The Second Circuit rejected the <u>res</u>

<u>judicata</u> defense even though the two lawsuits involved the some of the same

defendants, a similar course of fraud and two of the same securities.  <u>Id.</u> at 1464.

Despite these similarities, <u>res judicata</u> did not apply because "the second litigation

involved different transactions, and especially subsequent transactions" and, as a

result, "[t]he claim that First Jersey defrauded customers in the sale, purchase, and

repurchase of certain securities in 1975-1979 is not the same as the claim that First

Jersey defrauded customers in the sale, purchase, and repurchase of other

securities in 1982-1985."  <u>Id.</u>  As in <u>First Jersey Securities</u>, <u>res judicata</u> is

24

inappropriate here because the Florida Action and the present action involve different transactions.  The commonalities between the schemes alleged in the two lawsuits are overwhelmed by the volume of divergent allegations concerning different issuers, different perpetrators and different touting activity.

Thompson's contention that overlapping discovery in this case and the Florida Action justifies the application of res judicata is also incorrect.  In the Florida Action, the SEC sought discovery as to issuers other than Recycle Tech for the limited purpose of establishing that Thompson's violations were continuous an ongoing, a requirement to impose the sought injunctive relief.  (See Baker Decl., Ex. 14 at 54:21-55:5; see also id. at 56:11-57:12.)  In ordering such discovery to proceed, Judge O'Sullivan specifically noted that the requested documents did not "involve the exact claim in this lawsuit".  (Id. at 57:13-22.)  It would be inappropriate to invoke res judicata to bar this action based exclusively on discovery admitted for purposes of fashioning relief, but not establishing liability, in the prior action.  That is because, "[f]or purposes of res judicata, [t]he scope of litigation is framed by the complaint at the time it is filed."  Proctor, 715 F.3d at 412 (citing Computer Assocs., 126 F.3d at 369-70); see also First Jersey Sec., Inc., 101 F.3d at 1465 ("The notion that the agency must either perpetually expand its charges to pursue new unlawful acts in an ongoing proceeding or lose the ability to pursue the persistent violator for misdeeds between the start and conclusion of the proceeding would in effect confer on the miscreant a partial immunity from liability for future violations.  Such a

notion is both antithetical to the regulatory scheme and inconsistent with the doctrine of res judicata.").

B.    Settlement Negotiations with the SEC

Thompson next seeks summary judgment that the SEC's Division of Enforcement had, and breached, an enforceable obligation to recommend that the Commission approve his proposed settlement.  (See ECF No. 43 at 33-41.)  He requests specific performance under New York contract law or, in the alternative, promissory estoppel.  (Id.)  First, "specific performance" is an affirmative request for relief and not properly before the Court on this motion.  Defendant's request for dismissal also fails at the outset because the ultimate relief sought by Thompson could only arise if the Commission were required to accept the DOE's proposed settlement.  That is not the case, as Thompson concedes.  (See id. at 34.) Nevertheless, the even more limited summary judgment Thompson seeks is inappropriate on grounds of breach of contract or promissory estoppel.  First, at the very least, there are triable issues on these questions.  Second, it is well settled that the Government is only bound by agreements entered into by individuals with actual authority to bind the Government.  See Doe, 635 F.2d at 96; Merrill, 332 U.S. at 384; Zenith-Godley Co., 180 F. Supp. at 615-16; Berns & Koppstein, Inc., 271 F. Supp. at 435; Littlejohn, 1992 WL 122755, at *2.  At this stage, Thompson's breach of contract argument fails because there is an insufficient basis to find that the SEC lawyers with whom his lawyer negotiated lacked actual authority to bind the DOE to recommend the proposed settlement to the Commission.  Thompson's counsel was

26

informed at the time that this authority is vested exclusively in the Director of the DOE. (Pl.'s 56.1 ¶ 44.) On the record before the Court, Andrew Ceresney, the then-Director of the DOE, gave no such approval here. (<u>Id.</u>)

C.    <u>The Sufficiency of the Fraud Allegations</u>

The remainder of Thompson's motion seeks dismissal of the SEC's claims under Section 17(b), Section 10(b), Rule 10b-5 and Section 17(a). (<u>See</u> ECF No. 43 at 42-57.) As the Court has explained, this motion was converted from a motion to dismiss to one for summary judgment. The Court converted the motion so that it could consider the extensive materials that Thompson proffered, and, frankly, to preclude any potential argument that it was procedurally improper for the Court to consider materials outside the pleadings. Having reviewed the parties' submissions, it is clear to the Court that, in this portion of the motion, Thompson challenges the sufficiency of the allegations reflected on the face of the complaint. While Thompson has submitted certain materials to demonstrate the lawfulness of his conduct, he does not cite them here.[7] Nor has the SEC responded by citing materials outside the complaint.[8] (<u>See</u> ECF No. 53 at 39-55.) Thus, given the early stage of the case and the parties' framing of their arguments, the Court finds it appropriate to evaluate the sufficiency of the SEC's fraud allegations under Rule 12(b)(6), leaving Thompson's liability as a question for another day.

[7] The only material outside the complaint Thompson cites in this portion of the motion is a disclaimer that is referenced in the complaint. (<u>Compare</u> ECF No. 43 at 47 (quoting Explicitpicks.com disclaimer) <u>with</u> Compl. ¶ 44 (referencing disclaimer).)

[8] The only material outside the complaint the SEC cites here is a decision in the Florida Action that it submitted as an attachment to a declaration. (<u>See</u> ECF No. 53 at 42 (quoting Pizzani Decl., Ex. E).) The Court considers this a legal citation.

1.    Section 17(b)

Thompson argues that the SEC has failed to properly allege a Section 17(b) violation because the newsletters disclosed that Thompson's companies received compensation, that they had the ability to sell during the promotion and that they were not "not unbiased".  (See ECF No. 43 at 47.)  Section 17(b), however, requires more.  Under that provision, individuals publicizing stock in which they deal must disclose not only their "receipt" of compensation, but also the "the amount thereof". 15 U.S.C. § 77q(b); see also United States v. Ware, 577 F.3d 442, 448 (2d Cir. 2009) ("Any receipt and amount of [] compensation are material information, the disclosure of which is required by law.") (citing 15 U.S.C. § 77q(b)).

Although many of the newsletters disclosed a particular amount of compensation defendants' companies received for their touting activities, the SEC alleges these disclosures vastly understated that amount.  (Compare Compl. ¶ 16 (stating OTC Solutions acquired 18 million Blast shares) with id. ¶ 24 (stating Thompson's ExplicitPicks.com disclaimers misstated amount as 6 million shares); (compare id. ¶ 33 (stating Thompson's Microcapster acquired 3.7 million shares of Blue Gem) with id. ¶ 44 (stating ExplicitPicks.com disclaimer misstated amount as 1.5 million shares); compare id. ¶ 55 (stating OTC Solutions acquired 35 million shares of Lyric Jeans) with id. ¶ 67 (stating that "disclaimers misstated the consideration received for the promotional efforts"); id. ¶ 82 ("While OxofWallStreet.com disclosed that it was paid $375,000 for the promotion, Thompson, who controlled OxofWallStreet.com, in fact received $1.1 million for

promoting Smart Holdings."); compare id. ¶ 89 (stating that OTC Solutions acquired 212,000 shares of Mass Hysteria and Microcapster acquired 1.8 million shares of Mass Hysteria) with id. ¶ 93 (stating that "disclaimers misstated the consideration received for the promotional efforts").)

Thompson's arguments with regard to these allegations are unpersuasive. Although he quotes at length from an exemplar disclaimer that discloses an amount of compensation received, he does not comment on the accuracy of that amount. (See ECF No. 43 at 47.)  At this stage, the Court declines to make a finding as to the accuracy of the disclaimers.

Contrary to Thompson's assertion, this Court's Section 17(b) analysis comports with the opinion issued in the Florida Action dismissing the SEC's Section 17(b) claims.  See S.E.C. v. Recycle Tech, Inc., No. 12-cv-21656 (Lenard/O'Sullivan), 2013 WL 12063952 (S.D. Fla. Sept. 26, 2013).  In that case, the sole basis for the SEC's Section 17(b) claim was that defendants' newsletters allegedly misidentified the source of consideration received.  Id. at *8.  The Honorable Joan Lenard dismissed the Section 17(b) claim, finding that Section 17(b) does not require disclosure of the source of consideration received.  Id. **8-9.  Critically, the SEC did not allege in the Florida Action, as it does here, that the newsletters failed to accurately disclose the amount of consideration received.  Id. at *8.  In fact, it was undisputed that Thompson's newsletters accurately disclosed both the receipt of consideration and the amount received.  Id.  Thus, Judge Lenard's dismissal of the Section 17(b) claim does not suggest, as Thompson argues, that Section 17(b) only

requires disclosure that the published opinions "were bought and paid for" and "unbiased". (See ECF No. 43 at 47.) Section 17(b) plainly also requires disclosure of the amount of compensation received. Consequently, the Court declines to dismiss the Section 17(b) claim.[9]

### 2.   Section 10(b), Rule 10b-5 and Section 17(a)

Thompson also contends that the Court should also dismiss the SEC's Section 10(b), Rule 10b-5 and Section 17(a) claims. Thompson puts forth a variety of arguments in this regard: (1) that all of the SEC's claims premised on alleged omissions fail because Thompson lacked a generalized duty to disclose; (2) that Thompson's statement that he "may" sell the touted stock was not materially misleading; (3) that the failure to disclose the correct compensation received is immaterial; (4) that the SEC failed to alleged that Thompson knew that certain statements were false; (5) that Thompson's failure to disclose that he was acting in concert with other individuals was not actionable; (6) that certain statements are immaterial puffery or non-actionable opinions; and (7) that the bespeaks caution doctrine immunizes any alleged misrepresentations and omissions. As discussed below, all of these arguments lack merit.[10]

---

[9] In the potion of his motion addressing the SEC's Section 17(b) claim, Thompson additionally argues that the Section 17(b) claim should be dismissed because (1) there was no duty to disclose the number or identity of companies promoting the subject stock and (2) Thompson's disclosure that he "may" sell the stock sufficed under Section 17(b). (See ECF No. 43 at 48-50.) The Court considers these arguments irrelevant to the sufficiency of the SEC's Section 17(b) claim and instead addresses them in the context of the SEC's Section 10(b), Rule 10b-5 and Section 17(a) claims.

[10] In setting forth these arguments, Thompson often does not distinguish among Section 10(b), Rule 10b-5, Section 17(a)(1) and Section 17(a)(3). As noted above, with the exception of the scienter element, these statutory provisions have similar requirements. The Court references the applicable statutory provision only where it is material to the analysis.

a)   Lack of Generalized Duty to Disclose

Thompson first alleges that the SEC's omissions-based disclosure claims fail

because Thompson lacked a generalized duty to disclose the allegedly omitted

information.  (See ECF No. 43 at 42-45.)  Thompson correctly recognizes that

omissions are only actionable when there is a duty to disclose.  (See ECF No. 43 at

44 (citing Chiarella v. United States, 445 U.S. 222, 228 (1990).)  However, he

mistakenly contends that such a duty arises only in the context of a "fiduciary or

trust relationship" that does not exist here.  (Id. at 44-45.)  That contention is

wrong.

As a general matter, Section 10(b), Rule 10b-5 and Section 17(a) require that

when a company (or individual) "speaks", it must disclose all information necessary

to make its statement(s) not materially misleading—even where there is otherwise

no independent duty to disclose.  See In re Vivendi, S.A. Sec. Litig., 838 F.3d 223,

258 (2d Cir. 2016) (quoting Meyer v. Jinksolar Holdings Co., Ltd., 761 F.3d 245, 250

(2d Cir. 2014)) ("It is well-established in this Circuit that 'once a company speaks on

an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no

existing independent duty to disclose information' on the issue or topic."); Caiola v.

Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty

[to disclose] is not . . . a defense to Rule 10b-5 liability because upon choosing to

speak, one must speak truthfully about material issues."); United States v.

Donovan, 55 F. App'x 16, 22 (2d Cir. 2003) (explaining that, under Section 17(a), "a

duty to disclose may arise during a securities transaction if omission of a material

31

fact would make another statement misleading", i.e., "even in the absence of a fiduciary duty") (citing 15 U.S.C. § 77q(a)).  Thus, "'. . . so-called 'half-truths'— literally true statements that create a materially misleading impression—will support claims for securities fraud." Wilson, 671 F.3d at 130 (quoting S.E.C. v. Gabelli, 653 F.3d 49, 57 (2d Cir. 2011)).

Many courts have found that scalpers have a duty to disclose their financial interests in touted securities so that their promotional materials are not materially misleading.  See, e.g., Mausner v. Marketbyte LLC, No. 12-cv-2461-JM (NLS), 2013 WL 12073832, at **7-8 (S.D. Cal. Jan. 4, 2013) (finding that publishers of an online newsletter had a duty to disclose that companies whose stock they touted compensated them in cash, company stock, or both); United States v. Cannistraro, 800 F. Supp. 30, 82 (D.N.J. 1992) (finding that stock brokers' statements regarding certain securities "were rendered incomplete and misleading in that they failed to provide the complete picture, i.e., that the author and disseminators of the statements were financially interested in the success of the securities in the market."); S.E.C. v. Blavin, 557 F. Supp. 1304, 1312 (E.D. Mich. 1983), aff'd, 760 F.2d 706 (6th Cir. 1985) (finding that unregistered investment advisor's "failure to disclose his substantial ownership of stock in the companies he was touting, and his intent to sell them soon after recommending that they be bought, was a material omission in violation of § 10(b).").

In addition, some courts have found that scalpers have a relationship or trust or confidence with their subscribers that gives rise to a duty to disclose their

interests in touted stock.  See, e.g., S.E.C. v. Park, 99 F. Supp. 2d 889, 889-90 (N.D. Ill. 2000) (denying motion to dismiss Section § 10(b) and Rule 10b-5 claims against promoters because "it is possible that Defendants may have a relationship of trust and confidence with its subscribers so as to impose on them a duty to disclose their scalping activity"); Zweig v. Hearst Corp., 594 F.2d 1261, 1268 (9th Cir. 1979) (finding that newspaper columnist who served as "an informal financial adviser" to his readers and who "benefited from his relationship with his readers" had a duty to disclose his stock ownership because "with knowledge of the stock's market and an intent to gain personally, he encouraged purchases of the securities in the market.").

Under both lines of cases, the SEC's allegations are sufficient to state a claim; the SEC has not failed to assert an actionable duty to disclose.

   b)   Failure to Disclose Intent to Sell

Thompson next challenges the SEC's allegations that the newsletters' disclaimers were materially misleading because they "misstated the Defendants' intentions with respect to the shares they held", stating that they "'may' sell their shares when, in fact, their intent all along was to sell their entire positions, if possible" and, "[i]n fact, at the time of many of these these misleading disclosures Defendants had already begun the process of selling their positions."  (See Compl. ¶¶ 25 (Blast); 45 (Blue Gem); 68 (Lyric Jeans); 83 (Smart); accord ¶ 94 (Mass Hysteria).)  Thompson contends that the disclosures that he "may" sell the five

issuers' stock were not materially misleading.  (See ECF No. 43 at 49-50.)  He raises two arguments in this regard, neither of which succeeds at this stage.

Thompson first argues that a "will sell" disclosure would not have been appropriate because penny stocks trade in thinly traded markets where there may not always be an opportunity to sell.  (See ECF No. 43 at 49.)  The SEC does not contend, however, that Thompson should have made a definitive "will sell" disclosure.  Rather, the SEC argues that defendants should have disclosed that their "intent all along was to sell their entire positions, if possible".  (Compl. ¶¶ 25, 45, 68, 83, 94 (emphases added).)  This allegation is sufficient to pass muster.

Thompson further argues that the "may sell" disclosure was not materially misleading because this language conveys that Thompson was permitted, but not required, to sell.  (See ECF No. 43 at 49-50.)  Thompson bases this argument exclusively on Wilson.  See 671 F.3d 120.  In Wilson, plaintiff, a purchaser of auction rate securities ("ARS") for which Merrill Lynch served as the broker-dealer, sued Merrill Lynch for market manipulation under Section 10(b) and Rule 10b-5(a) and (c).  Id. at 123-24.  Plaintiff alleged that Merrill Lynch manipulated the ARS market by placing "support bids" in auctions where it served as sole or lead dealer without adequately disclosing the practice.  Id. at 124.  The district court granted Merrill Lynch's motion to dismiss.  Id. at 127-28.  At issue on appeal was whether Merrill Lynch's disclosure that it "may routinely" place such bids was incomplete and misleading in light of the fact that, according to plaintiff, Merrill Lynch placed such bids in every auction.  Id. at 131.

The Second Circuit concluded that Merrill Lynch's disclosures were not materially misleading for two reasons.  The Second Circuit first found that, contrary to plaintiff's argument on appeal, the complaint itself did not adequately plead that Merrill Lynch <u>always</u> placed support bids in every ARS auction.  <u>Id.</u> at 132-33. Thus, the Court held that, "If Merrill's intention was, as [plaintiff] alleges, to place support bids in every single auction <u>unless it decided to let certain auctions fail or withdraw from the market altogether</u>, we think that Merrill fairly disclosed that intention by stating that it 'may routinely' place such bids."  <u>Id.</u> at 133 (emphasis added).  The Second Circuit also reasoned that although plaintiff "read[] the word 'may' as speaking to the likelihood that Merrill would place support bids, an investor could more easily understand the word as disclosing merely that Merrill was permitted, but not required, to place" such bids.  <u>Id.</u>

The circumstances in this case are materially different from those in <u>Wilson</u>, requiring a different result.  To begin with, <u>Wilson</u> involved a market manipulation claim, whereas here, Thompson challenges a disclosure claim.  Further, unlike in <u>Wilson</u>, where plaintiff alleged that Merrill Lynch intended to place support bids in only <u>some</u> circumstances—that is, in all auctions except those it decided to let fail or from which it sought to withdraw—<u>see id.</u>, here the SEC alleges that Thompson always intended to sell the issuers' stock (<u>see</u> Compl. ¶¶ 3, 25, 45, 68, 83, 94).  This distinction is critical.  In <u>Wilson</u>, the Second Court found adequate a disclosure reflecting some uncertainty (Merrill Lynch "may routinely" place support bids) in part because the plaintiff alleged that Merrill Lynch harbored an uncertain intent

35

(the intent to place support bids "unless" it decided otherwise).  Here, by contrast, the SEC has alleged that Thompson intended to always sell his shares wherever possible.  In this context, the SEC's allegations are sufficient at this stage.

Moreover, the Court finds it more plausible here than in Wilson that a reasonable investor would construe the word "may" as "speaking to the likelihood" of Thompson selling as opposed to disclosing that Thompson "was permitted, but not required" to sell.  See Wilson, 671 F.3d at 133.  In Wilson, the disclosure at issue appeared in a document describing auction practices and procedures alongside at least two other statements describing what Merrill Lynch was "permitted" to do.  See id. at 125-26.  Given the complexities of the ARS market, and the context of the disclosures, it would be reasonable to construe the phrase "may" as describing Merrill Lynch's authority to place support bids.  The word "may" can naturally take on a different meaning where, as here, it appears in short disclaimers referring to sales in the general market, as opposed to documents describing complicated procedures governing a self-created auction.

> c)   Failure to Disclose Correct Compensation Received

Thompson next submits that a disclosure that he received 1.5 million shares of Blue Gem when he actually received more than 3 million shares is immaterial as a matter of law.  (ECF No. 43 at 55.)  The Court disagrees.  The Second Circuit has recognized that "[a]ny receipt and amount of [] compensation are material information".  Ware, 577 F.3d at 448.  Disclosures misstating the amount of compensation received are actionable not only under Section 17(b), but also under

Section 10(b), Rule 10b-5 and Section 17(a).  The SEC's allegation is sufficient to pass muster.

> d)   Failure to Allege Knowledge of Falsity

Thompson next argues that certain statements are not actionable because the SEC failed to allege Thompson knew they were false.  (See ECF No. 43 at 55-57 (discussing Compl. ¶¶ 40 (alleging that newsletter described a research analyst that favored the touted stock as independent without disclosing that it in fact was funded by one of the defendants), 90 (alleging that newsletter misleadingly stated that "Mass Hysteria's core management team had a combined $1.36 billion in box office sales.").)  In both instances, however, the SEC alleged that Thompson (and the other defendants) either "knew that many or all of their statements were false and/or misleading or recklessly disregarded their truth or falsity."  (Compl. ¶ 42; accord id. ¶ 91.)  The SEC's allegations thus state a claim.[11]

> e)   Failure to Disclose that Thompson Was Acting in Concert with Other Individuals

Thompson next seeks dismissal on the basis that, contrary to the SEC's allegations, he was not required to disclose that he was acting in concert with other newsletter publishers in promoting the stock.  (See ECF No. 43 at 48-49.) Thompson argues that this information is not required under Section 17(b), and

---

[11] The Court notes that, in his motion, Thompson asserts that the allegation regarding the movie industry experience of Mass Hysteria's management team is not false and is based on the "film credits and careers of Mass Hysteria's management, Dan Grodnik and Pat Proft, who were associated with franchises such as National Lampoon, Naked Gun and Scary Movie".  (ECF No. 43 at 56-57.)  Thompson cites no support in the record for the statement.  Therefore, the Court does not credit this statement for purposes of resolving this motion.

that "there is no principled basis on which to invent and superimpose on the statute a disclosure obligation regarding the extent or mechanics of a promotion." (Id. at 49.)

Thompson misunderstands the nature of the SEC's allegations in this regard. The SEC does not assert that disclosure of this information was required under Section 17(b). Instead, the SEC asserts that acting in concert with other newsletter publishers is itself deceptive conduct that violates Section 10(b) and Rule 10b-5(a) and (c) and Sections 17(a)(1) and (3). (See ECF No. 53 at 46-48.) Thompson does not challenge this allegation.

> f)    Statements of Corporate Optimism and Opinion

Thompson also asserts that certain statements are immaterial puffery or non-actionable statements of opinion. (See ECF No. 43 at 50-57.) The first grouping of statements he challenges on this ground are optimistic, forward-looking statements about the future performance of the Blast, Blue Gem and Lyric Jeans penny stocks being touted in particular newsletters. (See Compl. ¶¶ 19 (statement that Blast is a "hidden gem" that "could be ready to make a power move" and could "potentially explode . . . towards $.10 or higher" and that Thompson (and others) "believe Blast is flying under the radar" and that "there are amazing gains to be made here") (cited in ECF No. 43 at 52), 36-37 (statements that Blue Gem stock "could" rise to $1.00 per share and that defendants' analysts were "absolutely confident in their products, business model and management!") (cited in ECF No. 43 at 55), 58 (statement that Lyric Jeans "has the potential to bring our subscribers

monster returns" and "has more fundamentals than any other stock our team has been able to find at these price levels") (cited in ECF No. 43 at 56).)

Statements of general corporate optimism generally do not give rise to securities violations. IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 392 (2d Cir. 2015) (citations omitted); see also Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (explaining that, "[u]p to a point, companies must be permitted to operate with a hopeful outlook"). However, "opinions or predictions are not per se inactionable under the securities laws." In re Int'l Bus. Machines Corporate Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998) (citations omitted). "Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." Id. (citations omitted); see also Kleinman v. Elan Corp., plc, 706 F.3d 145, 153 (2d Cir. 2013) ("Subjective statements can be actionable only if the 'defendant's opinions were both false and not honestly believed when they were made.'") (quoting Fait v. Regions Fin. Corp., 655 F.3d 105, 113 (2d Cir. 2011)). Here, the SEC plausibly alleges that Thompson (and the other defendants) did not reasonably believe their statements.[12] See In re

---

[12] With respect to the Blue Gem, Lyric Jeans, Smart Holdings and Mass Hysteria promotions, the SEC alleges that "Defendants either knew that many or all of their statements were false and/or misleading or recklessly disregarded their truth or falsity." (See Compl. ¶¶ 42 (Blue Gem), 65 (Lyric Jeans), 80 (Smart Holdings); accord id. ¶ 91 (Mass Hysteria).) Likewise, with respect to the Blast promotion, the SEC alleges that "Defendants failed to inform investors that their own undisclosed trading contributed to much of the favorable price movements and increase in volume" they predicted, an allegation that suggests they did not reasonably believe that the securities independently had the touted value. (See id. ¶ 22.)

Int'l Bus. Machines Corporate Sec. Litig., 163 F.3d at 107.  These allegations suffice to state a claim.

The Supreme Court's decision in Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund—a case upon which Thompson heavily relies—does not counsel a different result.  See 135 S. Ct. 1318 (2015).  Omnicare involved securities fraud claims premised on opinion statements in registration statements. The opinion construed Section 11 of the Securities Act, an antifraud provision not at issue here.  See 15 U.S.C. § 77(k)(a).  Nevertheless, insofar as Omnicare does apply here,[13] it supports, rather than undermines the Court's finding that the projections are actionable.  Omnicare's central holding is that an opinion statement in a registration statement is actionable "if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'"  See Tongue, 816 F.3d at 209 (quoting Omnicare, 135 S. Ct. at 1327).  This standard is wholly consistent with the "reasonable belief" standard that precludes dismissal here.

The second allegation Thompson challenges as a non-actionable opinion is an alleged statement, in a newsletter, comparing OTC Solution's Smart Holdings listing to an initial public offering.  (See Compl. ¶ 75 (statement that a listing of

---

[13] The Second Circuit has not directly held that Omnicare applies to Section 10(b), Rule 10b-5 or Section 17(a) claims.  However, several recent cases suggest that Omnicare would apply to all antifraud provisions of the securities laws.  In Tongue v. Sanofi, the Second Circuit applied Omnicare to securities fraud claims arising under Section 10(b), Rule 10b-5 in addition to Section 11 without distinguishing among those provisions.  See 816 F.3d 199, 211-12 (2d Cir. 2016).  Further, in Cox v. Blackberry Ltd., the Second Circuit described Omnicare as a "significant development" that occurred after the district court rendered its decision on a Section 10(b) and Rule 10b-5 claim.  See 660 F. App'x 23, 25-26 (2d Cir. 2016).  Lastly, in Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., the Second Circuit assumed, arguendo, that Omnicare applied to a securities fraud claim under Section 18 of the Exchange Act and construed the claim under the Omnicare standard.  See 645 F. App'x 72, 76 n.3 (2d Cir. 2016), cert. denied, 137 S. Ct. 186 (2016).

Smart Holdings on OTC's marketplace was "'like' an initial public offering, giving investors a first look at the company"); see also id. ¶ 80 ("Among other things, Defendants knew or recklessly disregarded the fact that a listing on the OTC Link market place was not like an IPO.").)  While there is some subjectivity inherent in any comparison statement, at this stage of the case, the Court finds that the crux of this allegation appears to be factual.  The alleged fact conveyed through the statement was that investors would have the opportunity to invest in Smart Holdings in the first instance.  The SEC alleges that this representation was materially misleading because there had previously been a forward stock split resulting in defendants and several other entities owning substantial portions of the outstanding Smart Holdings stock.  (See Compl. ¶ 73.)  This allegation suffices to state a claim.

> g)    Bespeaks Caution Doctrine

Thompson lastly argues that the newsletters' forward-looking statements are not actionable because they are "accompanied by cautionary language and extensive disclaimers" that bespeak caution.  (ECF No. 43 at 54.)  The SEC responds that the bespeaks caution doctrine does not apply here, but that even if it did, Thompson does not satisfy its requirements.  (See ECF No. 53 at 53.)

At the outset, the Court notes that the federal securities laws have two separate, but similar, protections for forward-looking statements:  the common law bespeaks caution doctrine and the statutory safe harbor of the Private Securities Litigation Reform Act ("PSRLA").  See Iowa Pub. Emps.' Ret. Sys. v. MF Global,

41

Ltd., 620 F.3d 137, 141-42 (2d Cir. 2010) (distinguishing bespeaks caution doctrine from PSLRA safe-harbor provision); Rombach, 355 F.3d at 173 (same).  Both hold that forward-looking statements are non-actionable if they are accompanied by sufficient cautionary language.  See Rombach, 355 F.3d at 173.

The Court agrees with the SEC that the PSLRA's statutory safe harbor does not apply here.  There are two independent reasons.  The first is that the safe harbor applies only to private actions, not enforcement actions.  See 15 U.S.C. § 77z-2(c) (providing that safe harbor for forward-looking statements applies only in private actions); 15 U.S.C. § 78u-5(c) (same);  see also S.E.C. v. U.N. Dollars Corp., No. 01-cv-9059 (AGS), 2003 WL 192181, at *2 (S.D.N.Y. Jan. 28, 2003), aff'd sub nom. S.E.C. v. Harris, 96 F. App'x 778 (2d Cir. 2004); S.E.C. v. E-Smart Techs., Inc., 74 F. Supp. 3d 306, 324 (D.D.C. 2014).  The second is that the statutory bespeaks caution doctrine does not apply to penny stocks.  See 15 U.S.C. § 77z-2(b)(1) (providing that statutory safe harbor does "not apply to a forward-looking statement . . . that is made with respect to the business or operations of the issuer, if the issuer . . . issues penny stock"); 15 U.S.C. § 78u-5(b)(1)(C) (same);  see also U.N. Dollars Corp., 2003 WL 192181, at *2.

The Court notes, however, that Thompson did not attempt to invoke the PLSRA safe harbor.  His motion expressly references the "bespeaks caution doctrine", not the statutory protection, and exclusively cites authority interpreting the common law doctrine.  (See ECF No. 43 at 54 (citing Virginia Bankshares v. Sanberg, 501 U.S. 1097 (1991); Harden v. Raffensberger, Hughes & Co., Inc., 65

F.3d 1392 (7th Cir. 1995); <u>San Leandro Emergency Med. Grp. Profit Sharing Plan v.</u>

<u>Phillip Morris Cos., Inc.</u>, 75 F.3d 801 (2d Cir. 1996); and <u>In re Sec. Litig.</u>, 383 F.

Supp. 2d 566 (S.D.N.Y. 2005)).)  There is no doubt that the common law bespeaks

caution doctrine invoked by Thompson applies in enforcement actions and actions

involving penny stocks.  <u>See</u> <u>S.E.C. v. Meltzer</u>, 440 F. Supp. 2d 179, 191 (E.D.N.Y.

2006) (rejecting bespeaks caution doctrine on the merits in enforcement action

involving promotions of penny stock).  The Court does not understand the SEC to

argue otherwise.[14]

The Court concludes that, at this stage of the case, the bespeaks caution

doctrine appears to be inapplicable.  To begin with, many of the allegations

Thompson identifies are not covered by the doctrine because they are statements

concerning present facts, not forward-looking statements.  (<u>See</u> Compl. ¶ 40

(allegation that newsletters referred to a company that recommended Blue Gem

shares was an independent analyst, when it in fact was funded by Van Nguyen)

(cited in ECF No. 43 at 55), 44 (allegation that ExplicitPicks.com disclosed he

received 1.5 million shares of Blue Gem stock in the promotion, when it in fact

received more than 3.7 million shares) (cited in ECF No. 43 at 55), 75 (allegation

that newsletter stated Smart Holdings listing was "like" an initial public offering,

when it in fact was not) (cited in ECF No. 43 at 56), 90 (allegation that newsletter

stated that Mass Hysteria's management team had a combined $1.36 billion in box

---

[14] Although the SEC states, in its opposition, that the "bespeaks caution defense" does not apply in enforcement actions or in actions involving penny stocks, it cites primarily to the PSLRA safe harbor and cases construing it.  (<u>See</u> ECF No. 53 at 53 (citing 15 U.S.C. §§ 77z-2(c), 77z-2(b)(1), 78u-5(b)(1)(C); <u>U.N. Dollars Corp.</u>, 2003 WL 192181; <u>E-Smart Techs., Inc.</u>, 74 F. Supp. 3d 306, but also <u>United States v. Levy</u>, No. 11-cr-62 (PAC), 2014 WL 1483964 (S.D.N.Y. Apr. 9, 2014)).)

office sales experience, when they in fact did not) (cited in ECF No. 43 at 56-57).)
"It is settled that the bespeaks-caution doctrine applies only to statements that are
forward-looking." Iowa Pub. Emps.' Ret. Sys., 620 F.3d at 142 (citing P. Stolz
Family P'ship L.P. v. Daum, 355 F.3d 92, 96-97 n.3 (2d Cir. 2004)).

     The balance of the statements Thompson identifies as protected by the
bespeaks caution doctrine are the above-described forward-looking statements
concerning the future performance of the Blast, Blue Gem and Lyric Jeans stocks.
(See Compl. ¶¶ 19, 36-37, 58.)  These statements fall within the ambit of the
bespeaks caution doctrine because they are prospective.  See P. Stolz Family P'ship,
355 F.3d at 96-97.

     Even so, however, the doctrine certainly does not require dismissal at this
stage.  The bespeaks caution doctrine renders forward-looking statements non-
actionable only if the speaker "warns of the specific contingency that lies at the
heart of the alleged misrepresentation."  See id. at 97 (citing Hunt v. Alliance N.
Am. Gov't Income Trust, Inc., 159 F.3d 723, 729 (2d Cir. 1998)).  In I. Meyer Pincus
& Associates, P.C. v. Oppenheimer & Co., Inc., for example, the Second Circuit
applied the bespeaks caution doctrine to statements that securities offered in a
prospectus "frequently" traded at a premium because the prospectus also disclosed
that the shares "frequently" traded at a discount and that the offeror could not
predict the shares' ultimate trading prices.  See 936 F.2d 759, 762-63 (2d Cir. 1991).
Similarly, in Luce v. Edelstein, the Second Circuit applied the bespeaks caution
doctrine to statements in an offering memorandum concerning the potential cash

and tax benefits of the offered securities because the memorandum also warned investors that the predictions were "necessarily speculative in nature", that "no assurance could be given that these projections would be realized", and that "actual results may vary from the predictions and these variations may be material."  See 802 F.2d 49, 56 (2d Cir. 1986) (alterations omitted).

Unlike in I. Meyer Pincus and Luce, the disclaimers Thompson identifies do not appear to bespeak caution about the newsletters' optimistic price projections. Thompson cites language informing prospective investors about the source of the information, instructing them not to "rely solely on the information presented", and advising them to conduct their own due diligence.  (See ECF No. 43 at 54.)  These disclosures do not expressly warn of the specific risk inherent in the projections, however:  that the optimistic price increases might not come to fruition. Consequently, the bespeaks caution doctrine does not require dismissal.[15]

IV.   CONCLUSION

For the reasons set forth above, Thompson's motion for summary judgment (ECF No. 42) is DENIED.  Discovery remains stayed in this matter until August 11, 2017 or the resolution of the parallel criminal proceeding, whichever is earlier.  (See ECF No. 39.)

---

[15] The bespeaks caution doctrine does not appear to apply at this stage for the additional reason that the SEC has alleged that Thompson knew the price projections were untenable.  See Rombach, 355 F.3d at 173 ("'The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'") (quoting In Re Prudential Sec. Inc. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996)).

The parties shall provide another update to the Court on the status of the parallel criminal proceeding **not later than June 1, 2017, or within two weeks** of **the resolution of any appeals to the Appellate Division**, whichever comes first.

The Clerk of Court is directed to terminate the motion at ECF No. 42.

SO ORDERED.

Dated:      New York, New York
            March 2, 2017


_____
            KATHERINE B. FORREST
            United States District Judge