UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

            Plaintiff,

    vs.

ANTHONY J. THOMPSON, JR., JAY FUNG,
and ERIC VAN NGUYEN,

            Defendants,

    and

JOHN BABIKIAN and KENDALL
THOMPSON,

            Relief Defendants,

NEW YORK COUNTY DISTRICT
ATTORNEY,

            Intervenor.

Case No.: 14-cv-9126 (ALC)

---

**MEMORANDUM OF LAW OF DEFENDANT ANTHONY THOMPSON IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

THOMPSON
HINE

335 Madison Avenue, 12th Floor
New York, New York 10017
(212) 344-5680
*Attorneys for Anthony J. Thompson, Jr.*

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 4

A.   OTC Solutions and the Promotional Newsletters ................................................... 4

B.   The Prior Florida Action ........................................................................................ 7

C.   Mr. Thompson's Counsel's Negotiation and Resolution of the Florida and New York Actions........ 8

    1.   The Florida Action ...................................................................................... 8

    2.   The New York Proceedings .......................................................................... 9

    3.   The DOE Reneges on Its Own Agreement, Refusing to Present or Recommend the Settlement........ 13

D.   The Pending Complaint........................................................................................... 14

E.   The District Court's Decision ................................................................................ 14

F.   The Criminal Plea .................................................................................................. 15

ARGUMENT........................................................................................................................ 16

POINT I BECAUSE THE SEC HAS FAILED TO DEMONSTRATE THAT THERE ARE NO ISSUES OF FACT PERTAINING TO MR. THOMPSON'S DEFENSES, SUMMARY JUDGMENT SHOULD BE DENIED ..................... 16

POINT II THERE ARE MATERIAL FACTS IN DISPUTE REGARDING WHETHER THE SEC'S CLAIMS ARE BARRED BY THE NEW YORK SETTLEMENT........ 20

POINT III BY VIRTUE OF THE PLEA IN THE CRIMINAL CASE, THE SEC WOULD BE ENTITLED TO JUDGMENT RELATING TO RECYCLE TECH AND BLUE GEM .......................................................................... 20

POINT IV THE SEC HAS FAILED TO DEMONSTRATE THAT IT WOULD BE ENTITLED TO DISGORGEMENT OF ANY AMOUNT OTHER THAN $200,000 RELATING TO BLUE GEM ...................................... 21

    1.   Disgorgement of Blue Gem Amounts Received by Mr. Thompson ....................... 21

    2.   Penalties and Injunctive Relief Should Not Be Awarded....................................... 22

CONCLUSION...................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*7 W. 57th St. Realty Co., LLC v. CitiGroup, Inc.*,
   No. 13 Civ. 981 (PGG), 2015 U.S. Dist. LEXIS 44031
   (S.D.N.Y. Mar. 31, 2015) .........................................................................................18

*EDP Med. Computer Sys. Inc. v. United States*,
   480 F.3d 621 (2d Cir. 2014)...................................................................................18

*Honeycutt v. United States*,
   137 S. Ct. 1626 (2017)...........................................................................................22

*Kokesh v. SEC*,
   137 S. Ct. 1635 (2017)...........................................................................................22

*Mademoiselle Knitwear, Inc. v. Liz Claiborne, Inc.*,
   No. 98 Civ. 3252 (HB), 1999 U.S. Dist. LEXIS 8592 (S.D.N.Y. June 9, 1999).....................18

*Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*,
   779 F.3d 102 (2d Cir. 2015)...................................................................................17

*SEC v. Alternative Green Techs. Inc.*,
   No. 11 Civ. 9056 (SAS), 2014 U.S. Dist. LEXIS 173251
   (S.D.N.Y. Dec. 15, 2014)................................................................................21, 23

*SEC v. Balboa*,
   No. 11 Civ. 8731 (PAC), 2015 U.S. Dist. LEXIS 87281
   (S.D.N.Y. July 6, 2015) .........................................................................................23

*SEC v. Banner Fund Int'l*,
   211 F.3d 602 (D.C. Cir. 2000) ..............................................................................21

*SEC v. Church Extension of the Church of God*,
   429 F. Supp. 2d 1045 (S.D. Ind. 2005) .................................................................22

*SEC v. Conaway*,
   695 F. Supp. 2d 534 (E.D. Mich. 2010).................................................................23

*SEC v. Druffner*,
   802 F. Supp. 2d 293 (D. Mass. 2011) ...................................................................23

*SEC v. Elliot*,
   No. 09 Civ. 7594 (KBF), 2012 U.S. Dist. LEXIS 82992
   (S.D.N.Y. June 12 2012).........................................................................................24

*SEC v. First AmeriFirst Funding Inc*.,
    No. 3:07-cv-1188-D, 2008 U.S. Dist. LEXIS 36782 (N.D. Tex. May 5, 2008)....................22

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)....................................................................................................21

*SEC v. GTF Enters*.,
    No. 10-cv-258 (RA), 2015 U.S. Dist. LEXIS 20355 (S.D.N.Y. Feb. 19, 2015) ...................24

*SEC v. Haligiannis*,
    470 F. Supp. 2d 373 (S.D.N.Y. 2007).....................................................................................22

*SEC v. IShopNoMarkup.com.Inc.*,
    126 F. Supp. 3d 318 (E.D.N.Y. 2015), *aff'd,* 694 F. App'x 853 (2d Cir. 2017).....................24

*SEC v. Lewis*,
    492 F. Supp. 2d 1173 (D.S.D. 2007) .......................................................................................22

*SEC v. McCaskey*,
    2002 U.S. Dist. LEXIS 4915 (S.D.N.Y. Mar. 26, 2002) .........................................................22

*SEC v. Perez*,
    No. 09-cv-21977, 2011 U.S. Dist. LEXIS 132965 (S.D. Fla. Nov. 17, 2011) ........................23

*SEC v. Tavella*,
    77 F. Supp. 3d 353 (S.D.N.Y. 2015).......................................................................................22

*Simmtech Co. v. Citibank, N.A.*,
    No. 13-cv-6768 (KBF), 2016 U.S. Dist. LEXIS 102698
    (S.D.N.Y. Aug. 3, 2016), *aff'd,* 697 F. App'x 35 (2d Cir. 2007) ......................................17, 19

*Smith* v. *City of New York*,
    130 F. Supp. 3d 819 (S.D.N.Y. 2015), *aff'd*, 664 F.App'x 45 (2d Cir 2016).........................18

*Utility Audit Group v. Capital One, N.A.*,
    No. 14-cv-0097 (SJF)(GRB), 2015 U.S. Dist. LEXIS 40816
    (E.D.N.Y. Mar. 26, 2015) ..................................................................................................17, 18

*Woods v. Dunlop Tire Corp*.,
    972 F.2d 36 (2d Cir. 1992).......................................................................................................18

## INTRODUCTION

By this motion, the plaintiff seeks partial summary judgment predicated on a plea that was entered by Anthony Thompson in a criminal case in New York County. While the plaintiff would ordinarily be entitled to some relief based on the entry of a criminal plea, here the plaintiff asks for far more than it is entitled to receive. As discussed below, the criminal plea was expressly limited to two particular transactions, Recycle Tech and Blue Gem Enterprises ("Blue Gem"), and the SEC would be entitled to judgment only as to those two transactions which were the basis for and "essential" to the criminal resolution. A judgment already exists as to Recycle Tech and so that leaves only the transaction involving Blue Gem. Further, the amount of disgorgement should be limited to that which was actually received by Mr. Thompson, as opposed to all amounts received by the entity that published the newsletters. Absent other factual issues in dispute, therefore, plaintiff would be entitled to disgorgement order relating to Blue Gem.

However, the plaintiff's current motion also implicates broader issues arising from the extensive prior proceedings relating to this case, the related defenses, and the extent to which issues of fact pertaining to those defenses precludes a grant of summary judgment. In 2012, an action was commenced by the SEC against Anthony Thompson and others in the United States District Court for the Southern District of Florida (the "Florida Action") – the jurisdiction in which these transactions originated. Thompson Motion to Dismiss: ECF 42. In that action, the SEC alleged that Mr. Thompson had engaged in improper conduct through his dissemination of promotional newsletters during the period from January 2009 through 2010 in transactions orchestrated by Kevin Sepe. Exhibit B to Pizzani Dec. (ECF No. 54-2): Amended Complaint in *SEC v. Recycle Tech Inc*., et al., No. 12-cv-21656 JAL (S.D. Fla.) ("Florida Complaint"). The Florida Complaint focused on one particular issuer, Recycle Tech, but the SEC successfully

argued to the district court that its case against Mr. Thompson encompassed the series of transactions that all stemmed from the activities of Kevin Sepe, all involved the same key participants, and shared the same "common components." SEC Opp. to Motion to Dismiss (ECF No. 53) at 4-6). Because of those other related transactions, the SEC maintained, it was entitled to the harsher injunctive relief that it ultimately obtained. And those related transactions that were the subject of litigation in Florida include but are not limited to the transactions that are the subject of the instant complaint: Blue Gem, Mass Hysteria, Lyric Jeans and Smart Holdings.

In this case, the SEC is entitled to summary judgment only if it has demonstrated that there is no material issue of fact concerning whether its present action is barred by those prior proceedings. The SEC has argued in discussions with this Court that the District Court, Judge Katherine Forrest, previously denied the *defendant's* motion for judgment, but that prior decision does not end the discussion as to the impact of the SEC's arguably duplicative proceedings. The district court's prior decision appears to have been predicated on the fact that the SEC, plainly mindful of the issue of *res judicata*, scrupulously avoided even a mention of Kevin Sepe in its New York Complaint, and so the Court could not conclude that the matters at issue in New York involved the same set of Sepe transactions such that it would preclude the pending claims. Discovery has confirmed that this case really is a rehash of the issues and transactions that were dealt with in the Florida case. As a result, the SEC has not and cannot demonstrate that it is entitled to prevail on Mr. Thompson's defense of *res judicata*.

In addition, the Florida proceedings involving the SEC were followed by efforts to resolve the investigation being conducted by the New York office of the SEC which also form the basis for a defense asserted by Mr. Thompson. As of December 2013, Mr. Thompson had spent more than a year litigating the Florida Action and addressing the New York Proceeding.

Counsel for Mr. Thompson had repeatedly maintained, in discussions with the New York office of the SEC, that its investigation was an impermissible duplication of the Florida Action, but the SEC in New York had refused to cede the matter to Florida or curtail their own investigation.  At that point, Mr. Thompson's counsel entered into settlement discussions with the SEC in Florida. Because it made no sense for Mr. Thompson to settle one of the two proceedings if the other virtually identical matter was going to continue, counsel for Mr. Thompson also commenced negotiations with the New York office.  After discussions in December 2013, the SEC attorneys in New York forwarded to counsel a term sheet setting out the salient provisions of an agreement, and insisted that Mr. Thompson transfer $345,000 into escrow for disgorgement in order to proceed with the memorializing of the agreement.  As of January 15, 2014, those funds were transferred by the defendant.  The SEC then forwarded an Offer of Settlement prepared by SEC attorneys, that Offer of Settlement was finalized and executed, and Mr. Thompson's counsel was assured by the SEC in New York that the SEC's Department of Enforcement ("DOE") would present and recommend that resolution to the Commission for final approval.

Months then passed.  The SEC in New York continued to assure Mr. Thompson's counsel that the settlement was "moving forward."  Then, in August 2014, the SEC abruptly communicated to counsel for Mr. Thompson that it was refusing to proceed with the settlement. Notably, the reason that it put forth for its refusal – that it had "new" information regarding his involvement with other promotions – was patently inconsistent with the specific and written discussions with the SEC attorneys that had occurred during the negotiations.  In reality, the only changed circumstance appeared to be the fact that, in or about July 2014, the lead defendant, Kevin Sepe, agreed to cooperate and the New York County District Attorney's Office decided to move forward with a criminal case.  In light of those developments, the SEC apparently decided

3

that it would rather proceed with a parallel civil action, following behind the criminal indictment, rather than settle with the defendant, and it filed this action.

Judge Forrest also considered those circumstances, and concluded that *the defendant* was not entitled to judgment but she did not attempt to resolve the relevant factual issues.  To the contrary, she expressly stated that those facts raise a triable issue of fact in relation to the defenses asserted by Mr. Thompson.

## BACKGROUND

### A.     OTC Solutions and the Promotional Newsletters

The Florida Action and this New York Proceeding arise from a particular series of transactions that were originated by Florida businessman Kevin Sepe in 2009 and 2010 in which companies related to Mr. Thompson, Microcapster and OTC Solutions, were hired to disseminate promotional newsletters.  As discussed in the New York Complaint, Mr. Thompson disseminated promotional newsletters regarding "penny stock" companies to subscribers who had "double opted in" to his free penny stock newsletters.[1]  Mr. Thompson's business did not engage in spam, or distribute *any* unsolicited communications.  Instead, he set out, beginning in June 2009, to develop a subscriber database, made up of individuals who specifically sought to receive information about penny stocks.  That process began with internet advertising, targeted to web users who had entered particular search terms suggesting that they might be interested in receiving communications from newsletters with names like "Penny Stock Picks."  If the internet user clicked on the advertisement, he or she would be invited to enter their email address and sign up for a newsletter.  The enrollment process even then was not complete; the internet user

---

1   The SEC's New York Complaint refers to the following companies: Blast Applications, Inc. ("Blast Applications"), Smart Holdings, Inc. ("Smart Holdings"), Blue Gem Enterprise, Inc. ("Blue Gem"), Lyric Jeans, Inc. ("Lyric Jeans"), and Mass Hysteria Entertainment Company, Inc. ("Mass Hysteria").  All of the transactions except Blast Applications originated with and involved Kevin Sepe.

had to "double opt in" – by confirming again that they indeed wanted to receive the newsletter – before he or she would be added to the subscriber list.

Those newsletters constitute precisely the kind of "touting" activity that is contemplated and governed by a particular provision of the federal securities laws, Section 17(b) of the Securities Act of 1933, and Mr. Thompson's website and his newsletters included lengthy disclosures that contained the information called for by Section 17(b), *i.e.,* the fact that it was a paid promotion, the fact that he had received stock as compensation for the promotion, and the fact that he was able to sell the stock during the promotion.   From the outset, Mr. Thompson worked closely with experienced attorneys who advised him regarding the content of his disclosures and reviewed his newsletters.  As of June 2009, Mr. Thompson reached out for advice from attorneys Hank Gracin and Leslie Marlow, both established securities attorneys with a combined total of more than 50 years' experience who partnered to form Gracin & Marlow, LLP.  As explained by Ms. Marlow in sworn testimony in both the Florida and the New York Action, she believed and advised Mr. Thompson that "the most important thing" in relation to disclaimers is "that the public know, even if it's not stock, that somebody is compensated, and that they're biased because that tells me that this is a paid promotion and that somebody is showing you one side of things, basically." Exhibit 1 to the Declaration of Maranda Fritz ("Fritz Dec.") at Exhibit 1: Transcript of Sept. 16, 2013 Deposition of Leslie Marlow ("Marlow Tr.") 103:11-20.

Based on the advice from counsel, the newsletters, literally in bold print, told the subscribers "to conduct their own due diligence," and then included the detailed disclaimer, stating that "investing in penny stocks is highly speculative," an investor should "never" purchase the profiled security unless he "can afford to lose [his] entire investment," and that the

reader agreed to hold the website harmless from any loss.  The newsletters explained the source of the information about the company, stating that it is "provided by the companies profiled" or publicly available, that the information is "not guaranteed," that it "does not purport to be a complete statement or summary of available data."  And the newsletters disclosed that the publisher received compensation (and the amount of it), and that it may sell "part or all" of the shares that it received "during the period of the promotion."  Exhibit 2 to Fritz Dec: ExplicitPicks.com Newsletter/Blue Gem.

Mr. Thompson's continuing efforts to comply with industry regulations is reflected in an email communication in February 2010:

> Leslie and Hank,
>
> As always I want to stay compliant with SEC regs regarding disclosure. Do you think we are taking the necessary steps? We are disclaiming all compensation in emails and on our website while many sites simply disclose in their emails. We are not doing work with any pink sheets so as to only deal with fully reporting companies.  We are keeping logs of our due diligence on the companies and sectors they are in.
>
> I stay up at night sometimes wondering if we are doing enough.  I feel like we are and I feel like we do more than our competitors.  The biggest emailer out there right now is a 23 year old kid who I was told just made $7 mill on a stock PEPR that didn't do so well.  I looked at his email disclaimer and he indicated that he was paid $50,000 on SKTO, not even the right company. To me I see that kind of behavior and I think to myself, that kid is going to get smoked!

*Id.* at Exhibit 3: Email from Thompson to Gracin and Marlow, Feb. 21, 2010.

Mr. Thompson not only continued to work with Gracin & Marlow but also sought the advice of attorneys at Parsons Behle & Latimer including Brent Baker, formerly with the Division of Enforcement ("DOE" or "Division") of the SEC. In March 2010, Mr. Thompson asked Mr. Baker to "review our site disclaimers for Eric, Jay and myself" and "let me know if you think they are strong enough or if we need to make additions."  *Id.* at Exhibit 4: Email from Thompson to Baker, Mar. 25, 2010.  Leslie Marlow and the Parsons firm then worked together

and prepared a revised disclaimer which, again, emphasized that the newsletter was part of a promotional campaign and included the extensive warnings about the risk of speculative securities and a statement concerning compensation.  *Id.* at Exhibit 5: Email between Marlow and Taylor, April 30, 2010-May 10, 2010.

As Ms. Marlow confirmed in her testimony in the Florida Action, "Mr. Thompson was very concerned about making sure he complied with anything that the SEC would have wanted him to comply with.  I mean, that was the purpose of hiring me in the first place."  *Id.* at Exhibit 1, 80:7-12.  Ms. Marlow explained again, later in her testimony, that Mr. Thompson "wanted to make sure he was doing everything that somebody would have thought was appropriate in accordance with the SEC regulations on the promotions."  *Id.* at 95:24-96:3.

### B.      The Prior Florida Action

In the Florida Action, the Commission alleged, *inter alia,* that Thompson and OTC participated in a pump-and-dump scheme, "concocted" and "orchestrated" by Kevin Sepe.  The SEC alleged in the complaint that Thompson, OTC Solutions and others were hired by Sepe to promote Recycle Tech stock through electronic newsletters, in exchange for shares of Recycle Tech stock. Although the complaint in the Florida Action focused on a particular company, Recycle Tech, it quickly became clear that the scope of that action was much broader: it included the time period from January 2009 through December 2010 and it extended to all of the other companies that involved Sepe including Blue Gem, Lyric Jeans and Mass Hysteria.[2]

Because both the Florida and New York offices of the SEC were focusing on and demanding information regarding the same set of transactions, Mr. Thompson's counsel objected to the duplicative demands and proceedings.  The Florida court then asked the SEC to explain

---

2   Exhibit 1 to the Fritz Decl. at Exhibit 11: Deposition of Anthony Thompson, October 15, 2013, pp. 71-74, 91-93, 198-200, 205-06, 223-26, 238-39.

the scope of its requests and their relevance to the Florida Action.  The SEC responded that ***its case encompassed the "numerous promotional campaigns," particularly those involving "the main architect of this whole fraud," Kevin Sepe.***  *Id.* at Exhibit 14: Tr. of Hearing of October 31, 2013 at 53:8-57:18.   Based on the SEC's assertion that the Florida Action included not just Recycle Tech but the "numerous promotional campaigns" involving Kevin Sepe, the Court held that the documents regarding Blue Gem, Mass Hysteria, Lyric Jeans and Smart Holdings were "relevant and discoverable."[3]  Thus, the SEC prevailed in its assertion that the transactions at issue in this case were part of the Florida Action.[4]

Having received and presumably reviewed those documents, the SEC in the Florida action obviously could have, but declined to, amend its complaint.

### C.      Mr. Thompson's Counsel's Negotiation and Resolution of the Florida and New York Actions

#### 1.      The Florida Action

After the SEC in the Florida Action was able to persuade the court that all of the Sepe transactions were properly included in its case and were relevant to its demand for injunctive relief, the parties resumed their settlement discussions.  Counsel for Mr. Thompson agreed to full injunctive relief including a penny stock bar, and an agreement to settle the Florida Action was reached in mid-January of 2014.  Pursuant to the parties' settlement agreement, at the SEC's insistence, Thompson and OTC deposited $493,239.76 into counsel's trust account to cover the agreed-upon amount for disgorgement, prejudgment interest and civil penalties, and entered into Consents of Final Judgment of Permanent Injunction and Other Relief, drafted by the SEC, filed

---

3   *Id.* at Exhibit 15: Order on Informal Discovery Conference, October 31, 2013.

4   Thompson and OTC subsequently responded to those discovery demands, as ordered by the Court, relating, *inter alia*, to Blue Gem, Mass Hysteria and Lyric Jeans. *See id.* at Exhibit 16: OTC's Responses to the Commission's Second Set of Interrogatories; *id.* at Exhibit 17: Thompson's Responses to Commission's Second Set of Interrogatories; *id.* at Exhibit 18: OTC's Responses to Second Requests for Production of Documents; *id.* at Exhibit 19: Thompson's Responses to Second Requests for Production of Documents.

on January 13, 2014 (the "Consents").[5]  Pursuant to the Consents, Thompson and OTC, without

admitting or denying the allegations in the Complaint, consented to entry of a final judgment

that, *inter alia*, (a) permanently restrains and enjoins them from violations of Sections 5(a), 5(c)

and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5; (b) orders

payment of disgorgement in the amount of $349,504.61 plus prejudgment interest thereon in the

amount of $23,735.15, jointly and severally; (c) orders payment of a civil penalty of $120,000,

jointly and severally; and (d) imposes a penny stock bar.[6]

### 2.    The New York Proceedings

Given the fact that two SEC regional offices were focused on the same conduct, Mr.

Thompson was adamant that any settlement would have to include both the Florida Action and

the New York Proceeding.  To that end, on December 16, 2013, counsel for Thompson emailed

Peter Pizzani (Senior Counsel at the DOE in New York) to try to "schedule a time to talk about

the status of this matter and [a] possible resolution."  *Id.* at Exhibit 26: Emails dated December

16, 2013-December 20, 2013.  Mr. Pizzani responded to this email on December 16, 2013,

copying other counsel for the DOE (Michael Osnato, then assistant director of the New York

Regional Office), confirming that DOE would be "willing to discuss and ultimately recommend"

a resolution that included an antifraud injunction, a penny stock bar and collateral bars,

disgorgement, and payment of a penalty.  *Id.*

On December 19, 2013, counsel for Thompson responded to Mr. Pizzani's December 16,

2013 email, stating that he had spoken to the client, that the client was "genuinely open to

discussing the terms you laid out in your email," and suggesting a conference call the following

---

5  *See id.* at Exhibit 20: Trust Agreement, January 14, 2014; *id.* at Exhibit 21: Consent of Defendant Anthony Thompson to Final Judgment of Permanent Injunction and Other Relief; *id.* at Exhibit 22: Consent of Defendant OTC Solutions LLC to Final Judgment of Permanent Injunction and Other Relief.

6  *See id.* at Exhibit 23: Final Judgment of Permanent Injunction and Other Relief as to Anthony Thompson; *id.* at Exhibit 24: Final Judgment of Permanent Injunction and Other Relief as to OTC Solutions LLC.

day.  *Id.*  Counsel for Thompson spoke with Mr. Pizzani and Mr. Osnato regarding settlement on December 20, 2013.

Following further discussions, on January 7, 2014, the Division (through Mr. Pizzani) sent counsel for Thompson a settlement term sheet.  *Id.* at Exhibit 28: Letter & Term Sheet. Notably, in the January 7, 2014 letter, Mr. Pizzani made clear he was expressing the position of the DOE, and had actual authority to negotiate and enter into settlement agreements on behalf of the DOE, with the settlement subject only to approval by the Commission:

> As you know, any settlement must be approved by the full Commission and the **terms outlined herein are representative only of the position of the Division of Enforcement.** The staff will not recommend any settlement offer until we receive proof that all funds to [*sic*] paid pursuant to the proposed settlement have been placed in escrow.

*Id.* (emphasis added).

Counsel for Mr. Thompson made revisions to the term sheet in redline and returned it to Mr. Pizzani and Mr. Osnato on January 9, 2014. Among the changes, Thompson sought confirmation that any settlement would cover "any and all claims arising from the Commission's investigation pursuant to a formal order of investigation *in re Blast Applications, Inc.* (NY-8264)," with the exception of claims in the *Recycle Tech* Action.  *Id.*

Counsel for Thompson had several telephone calls with Mr. Pizzani and Mr. Osnato regarding settlement and the term sheet in the week after January 7, 2014. During one of these calls, Mr. Osnato and Mr. Pizzani confirmed that the settlement would extend to all conduct that was under investigation in the New York Proceeding, and agreed to reduce the total settlement amount for disgorgement, penalties and interest to approximately $345,000 (plus interest through August 13, 2013), as requested by Thompson.  Mr. Osnato suggested that the parties effectuate settlement by an Offer of Settlement, rather than the term sheet originally proposed by the DOE. Mr. Osnato further indicated the DOE would prepare an Offer of Settlement if Thompson would

deposit the settlement funds into counsel's trust account. Thompson's counsel agreed with this approach.

At that point in January 2014, Mr. Thompson understood that there was an agreement on the essential terms in relation to *both* the New York and Florida actions and so he proceeded to finalize both. On January 13, 2014, the settlement documents in the Florida Action were executed and, on January 15, 2014, counsel for Thompson emailed Mr. Pizzani in New York to inform him that "[t]he money ($345,000 plus amount roughly equal to prejudgment interest through August 2013) is in [*sic*] currently my trust account for use in settling this matter subject to consideration and approval by the Commission."  *Id.* at Exhibit 29:  Email Baker/Pizzani January 15, 2014.  The New York DOE attorneys then drafted and sent a proposed Offer of Settlement to counsel for Thompson by email.  *Id.* at Exhibit 30: Email communication dated January 15, 2014.  That proposed Offer of Settlement failed to include that parties' agreement that the settlement covered all of the companies and conduct being investigated by the SEC and so counsel for Thompson proposed changes to the Offer of Settlement to ensure it correctly identified the scope of the settlement agreed upon by the parties.

After trading further drafts of the Offer of Settlement, counsel for Thompson had a phone call with Mr. Pizzani, Mr. Osnato and Thomas Smith (Assistant Regional Director in the New York Office) regarding settlement on March 28, 2014. During the conversation, Mr. Osnato suggested that the parties enter into separate agreement to confirm that the settlement included all companies and conduct under investigation, rather than making further amendments to the Offer of Settlement.  *Id.* at Baker Decl. ¶ 26.

Following the March 28, 2014 telephone call, counsel for Thompson emailed Mr. Pizzani to confirm their conversation:

> [A]s we have discussed several times as part of our settlement negotiations, our understanding is that this Offer of Settlement/Agreement is meant to cover all of the legal and factual issues referenced in all subpoenas issued under the Formal Order of Investigation in the Matter of Blast Applications, Inc. (NY-8264). Can the Staff please confirm that our understanding is correct and consistent with the scope of the recommendation being presented by the Staff to the Commission in this matter.[7]

*Id.* at Exhibit 25:  March 28, 2014 Email.

Mr. Pizzani responded to this email, copying Mr. Osnato and Thomas Smith, the same day as follows: ***"This will confirm that your understanding is correct and consistent with the scope of the recommendation being presented to the Commission."*** *Id*. (emphasis added).

After that separate agreement was confirmed, Thompson agreed to execute and deliver the Offer of Settlement as drafted by the DOE. The SEC later sought some additional revisions, and Thompson submitted the fully executed Offer of Settlement to the Division on June 6, 2014. *Id.* at Exhibit 31: Offer of Settlement.

After delivering the executed Offer of Settlement, counsel for Thompson contacted Mr. Pizzani on several occasions to determine the status of the settlement and to see when the Offer of Settlement would "get into the queue to be approved by the Commission."  *Id.* at Exhibit 32: Email from Brent Baker dated July 16, 2014.  Mr. Pizzani did not give any indication that there were any problems with the settlement, or that additional approval was necessary from within the Division itself. Rather, he responded, simply, "It is being moved along," and "things were delayed because we were waiting for the other offer [from Fung and Pudong]."  *Id*.

At all relevant times during the settlement discussions, the Division Staff—including through Mr. Pizzani, Mr. Osnato and Mr. Smith—represented, through statements and actions,

---

[7]  Those subpoenas in the New York investigation had referenced Blast Applications, all of the Sepe transactions that appear in this Complaint, and various other promotional campaign during that time period.  *Id.* at Baker Decl. ¶ 35 and Exhibits 33 and 34.

that they had full and actual authority *to negotiate and enter into a settlement on behalf of the DOE and agree to recommend that settlement to the Commission.*

Thompson understood - based on the representations of the DOE - that the DOE had agreed to and was in the process of presenting the executed Offer of Settlement to the Commission for approval, accompanied by the recommendation of the DOE that the Commission accept the Offer.

### 3.    The DOE Reneges on Its Own Agreement, Refusing to Present or Recommend the Settlement

Unexpectedly, in two telephone calls in August 2014, Thomas P. Smith and Peter Pizzani of the DOE in New York advised counsel for Thompson that they had not submitted, and would not be submitting, the Offer of Settlement to the Commission with a recommendation to approve the settlement.  Mr. Smith and Mr. Pizzani told counsel for Thompson that they were refusing to go forward with the agreement because they had "come to learn of new information" since the time the agreement was negotiated.  *Id.* at Baker Decl. ¶ 34.  This new information, they stated, consisted of the fact that Mr. Thompson had engaged in the same conduct but with respect to "newly discovered" issuers - Smart Holdings, Mass Hysteria, Blue Gem and Lyric Jeans." *Id.*

That claim was contrary to the DOE's multi-year investigation, the broad scope of the investigative subpoenas, and the express agreement with DOE incorporating and covering those other transactions.  *Id*. ¶ 35 and Exhibits 33 and 34.

On August 18, 2014, counsel for Thompson and Fung had an escalation call with DOE Staff and the Director of the Division of Enforcement, Andrew Ceresney, regarding the DOE's attempted repudiation of its agreement to submit the Offer of Settlement to the Commission and to recommend settlement.  During that escalation call, and at a subsequent meeting with counsel, Mr. Ceresney insisted that any agreement negotiated by DOE Staff is final and binding only if

approved **by him.**  *Id.* ¶ 36.  Mr. Ceresney stated that the DOE had no obligation to honor its

agreement to submit the Offer of Settlement to the Commission, and recommend its approval,

because **he** had not approved it – an assertion that contradicted the representations made by the

DOE Staff, including Mr. Pizzani, Mr. Osnato and Mr. Smith, in negotiating and entering into

the agreement on behalf of the DOE with Mr. Thompson.  *Id.*

> ### D.     The Pending Complaint

It was after the repudiation of that agreement that, on November 17, 2014, the SEC filed

its Complaint in this action.  The Complaint states that it deals with the period November 2009

through September 2010 --a period encompassed by the Florida Action --  and deals with five

particular stocks – including the same transactions that related to Kevin Sepe and that were part

of the document demands and testimony in the Florida Action. Complaint ¶ 1. The Complaint

alleges violations of Section 17(a) and (b) and Section 10(b) and Rule 10b-5,  just like the

Florida Action.  Those claims are based on the allegations that Mr. Thompson's newsletters were

"misleading" because they disclosed that he "may" or "might" sell stock that he had received,

and failed adequately to disclose his compensation,  just like the Florida Action.  *Id.* ¶¶ 3, 5.

> ### E.     The District Court's Decision

At the urging of the SEC, the District Court denied Mr. Thompson's motions to dismiss

regarding the prior Florida action and the New York agreement.[8]  With respect to the issue of ***res***

***judicata***, the District Court appeared to rely on the facts that the particular transactions at issue in

the New York case were "not mentioned in the Florida Complaint" while the New York

Complaint did not allege the role of Kevin Sepe and his associates or even mention them.  ECF

No. 64: Opinion at 22.  Instead of focusing on the fact that all of the Sepe transactions were

---

[8] Because the defendant was relying on filings from the Florida Action and other documents, the Court converted the motion into one for summary judgment.

actually at issue in the Florida Action, and that res judicata applies where the subsequent claim
was or could have been asserted in the first proceeding, the District Court stated that "for
purposes of res judicata, the scope of litigation is framed by the complaint at the time it is filed."
Opinion at 25.

      With respect to Mr. Thompson's settlement agreement with the DOE, the District Court
did not address the specific issue of whether the DOE was bound by its clear agreement to
present and to recommend a settlement to the Commission.  Opinion at 26.  The Court confirmed
that there were, in any event, "triable issues" of fact concerning the operation of estoppel or
breach.  Opinion at 26.

      **F.**    **The Criminal Plea**

      As had been anticipated, the SEC's decision to refuse to proceed with the settlement was
predicated on its learning that, after extensive delays, the New York County District Attorney's
Office ("DA's Office") had procured the cooperation of Keven Sepe and was proceeding with an
indictment of Mr. Thompson and others.  That Indictment was filed on September 11, 2014, and
contained more than 80 charges ranging from a B to an E level felony.  From 2014 on, that
action was litigated in New York State Supreme Court and as of August 2017 only 7 E felony
counts remained.  At that point, the DA's Office offered Mr. Thompson the opportunity to plead
to two particular transactions, Recycle Tech and Blue Gem, and pay a total of $896,000.00, and
receive a sentence of a conditional discharge.  As part of a "repleader" arrangement, Mr.
Thompson also plead guilty to one count of a Martin Act Scheme to Defraud; that plea would be
withdrawn upon payment of the settlement amount.   Mr. Thompson was given one year to pay
the settlement figure of $896,000.00.

      As we have previously advised this Court, Mr. Thompson was ultimately not able to pay
that amount.  Years earlier, in 2010 and 2011, the Thompson family had established trusts and

the income earned by Mr. Thompson from his business and real estate that was purchased was placed into two trusts.  Since he was indicted by the DA's Office in 2014, Mr. Thompson had lost any ability to earn significant income, and the family had accessed the funds in trust to pay virtually all of the expenses for Mr. and Mrs. Thompson and their three young children.  Over the same time period, Mr. Thompson's marriage failed, and his ex-wife became increasingly determined to gain control of any assets that remained.  After Mr. Thompson entered into the agreement with the D.A.'s Office in 2017, she filed litigations designed to prevent any disbursements from the trusts of funds to pay the disgorgement, although the funds in that trust were the direct proceeds of the transactions at issue in the SEC and in the charges filed in New York.   Ultimately she prevailed in those litigations and her father now controls the trusts.  As a result, the amounts set forth in the agreement with the D.A. were never paid.  Because those amounts were not paid, Mr. Thompson was then sentenced to serve a year in jail, and he is currently incarcerated.

**ARGUMENT**

**POINT I**

**BECAUSE THE SEC HAS FAILED TO DEMONSTRATE THAT THERE ARE NO ISSUES OF FACT PERTAINING TO MR. THOMPSON'S DEFENSES, SUMMARY JUDGMENT SHOULD BE DENIED**

Mr. Thompson has, from the outset, asserted as a defense that the SEC's claims in this case are barred under the doctrine of *res judicata*.  Defendant established that the SEC, in two different proceedings, pursued claims and sanctions that are predicated on a series of transactions involving the same individuals during the same time period; the SEC in the Florida Action even litigated whether all of these transactions were properly part of that proceeding, and won.  All of the Sepe transactions, including Recycle Tech and Blue Gem, were specifically addressed in that case, and relief was expressly sought based on those same transactions.

16

Notably, the defense relied in large part on a decision issued by the District Court that was overseeing this case, Judge Katherine B. Forrest.  That decision confirmed that *res judicata* "precludes the parties or their privies from relitigating issues that were ***or could have been raised*** in that action."  *Simmtech Co. v. Citibank, N.A.*, No. 13-cv-6768 (KBF), 2016 U.S. Dist. LEXIS 102698, at *17 (S.D.N.Y. Aug. 3, 2016), *aff'd*, 697 F. App'x 35 (2d Cir. 2007) (internal citations omitted) (emphasis added).  In that decision, Judge Forrest addressed specifically the application of *res judicata* in the context of claims that had *not* been asserted in a prior litigation. The plaintiff there insisted that the prior litigation "focused" on particular aspects of the prior transactions and so its current claims were not precluded.  Judge Forrest disagreed, stating that "[a]s long as the later claim arose 'out of the same factual grouping as an earlier litigated claim,' it is barred even if it 'is based on different legal theories or seeks dissimilar or additional relief.'"  *Id*. at *20.

> The bottom line is that plaintiff cannot slice and dice its theories into separate lawsuits.   The doctrine of *res judicata* applies 'not only to what was pleaded but also as to what could have been pleaded.'   The claims in this action could have been pleaded in the [prior] action. Plaintiff chose not to do so, and cannot have a second bite at the apple.

*Id*. at *23 (internal citation omitted).  S*ee also Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc*., 779 F.3d 102, 108 (2d Cir. 2015) (held that doctrine precludes not only litigation of claims raised and adjudicated in a prior litigation between the parties (and their privies) but also of claims that might have been raised in the prior litigation but were not).

The decision in *Utility Audit Group v. Capital One, N.A*., No. 14-cv-0097 (SJF)(GRB), 2015 U.S. Dist. LEXIS 40816 (E.D.N.Y. Mar. 26, 2015), underscores the clear principles that govern this case.  The court discussed at some length the relevant authorities including those that plainly state that "claim preclusion 'does not require the precluded claim to actually have been

litigated; its concern, rather, is that the party against whom the doctrine is asserted had a full and fair opportunity to litigate the claim.'" *Id.* at *30-31 (quoting *EDP Med. Computer Sys. Inc. v. United States*, 480 F.3d 621, 626 (2d Cir. 2014)).  Further, that issue of whether a claim could have been litigated turns on whether the "same transaction or series of transactions" are involved, whether the "underlying facts are related in time, space, origin or motivation," whether "'the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first.'"  *Id*. at *32 (citation omitted).  *See also Woods v. Dunlop Tire Corp*., 972 F.2d 36, 38 (2d Cir. 1992); *Mademoiselle Knitwear, Inc. v. Liz Claiborne, Inc.*, No. 98 Civ. 3252 (HB), 1999 U.S. Dist. LEXIS 8592, at *15, 20 (S.D.N.Y. June 9, 1999) (granting motion to dismiss claims, even though claims not asserted in prior litigation, because they arose from "the same connected series of transactions . . . -- a grouping of interrelated contracts and agreements made during the course of an ongoing business relationship" and because those claims were "in existence . . . before or during" the prior case); *7 W. 57th St. Realty Co., LLC v. CitiGroup, Inc.*, No. 13 Civ. 981 (PGG), 2015 U.S. Dist. LEXIS 44031, at *94 (S.D.N.Y. Mar. 31, 2015) (held that claims in subsequent action were barred where they could have been raised by counterclaim and plaintiff was "on inquiry notice" of those further claims);  *Smith* v. *City of New York*, 130 F. Supp. 3d 819, 828-29 (S.D.N.Y. 2015), *aff'd*, 664 F.App'x 45 (2d Cir 2016) (granting defendant's motion to dismiss based *inter alia* on *res judicata* effect of prior litigation because "claim that 'could have been raised in the prior action' is precluded by a prior judgment if the purportedly new claim 'was sufficiently related to the claims that were asserted in the first proceeding that it should have been asserted in that proceeding") (citation omitted).[9]

---

[9] Those same precepts are equally applicable to a consent judgment obtained by the SEC.  In *SEC v. King Resources*, the court relied on a "decree of final judgment of permanent injunction by consent, issued in *y*, Civil Action No. C-2858 (D. Colo. Feb. 9, 1971)," wherein the SEC "sought and successfully obtained a permanent injunction against King Resources enjoining that company from violating Section 5 of the Securities Act of 1933 [as well as] Section 17(a) of the Securities Act and Rule 10b-5. *Id.* at 257.  The court observed:

Notwithstanding the clarity of decisional authority, including the District Court's own seemingly dispositive ruling in *Simmtech*, the District Court denied defendant's motion.  Oddly, the court failed even to acknowledge its own decision in *Simmtech,* or any of the other cases illustrating that *res judicata* is ***not*** limited to instances where the claim was actually articulated in the complaint but also includes instances in which the claim was part of the same set of transactions and ***could have*** been presented in the prior action.  Opinion at 22, 26.

More importantly for this motion, the District Court's decision appears to have been based on the particular *allegations* contained in the SEC's New York complaint, in which the SEC was exceedingly careful not to mention Keven Sepe and sought to obscure the precise parallels between the two cases.  The District Court recognized that the Sepe transactions were litigated in Florida but could not conclude, on the record at that time, that the New York case would in fact litigate that same series of transactions.  As emphasized by the District Court, "the SEC does not presently allege that Sepe, Halperin and Gonzalez played *any* part in the five schemes at issue here, let alone the supervisory roles that they played in the Recycle Tech scheme.  Indeed, these three individuals are not mentioned in the instant complaint."  Opinion at 22.

Since then, discovery has confirmed that, although the SEC deliberately avoided discussing Sepe in the complaint, the claims here are precisely the same ones that were charged and incorporated by the SEC into the Florida Action.  They are the series of transactions originated by Kevin Sepe and his associates, and include Blue Gem, Mass Hysteria, Lyric Jeans

---

[T]he Colorado decree can fairly be read to extend to and enjoin the acts now charged against the defendant. The injunction of the Colorado Court, which paraphrases the language of Section 17(a) and Rule 10b-5 may properly be construed to prohibit the acts committed by King Resources which the S.E.C. now wishes to further enjoin. …We therefore hold that the injunction issued by the Colorado Court in *Securities & Exchange Commission v. King Resources Company*, *supra*, is *res judicata* to the present suit, as to that defendant, and may properly be set up as a bar to this action.

and Smart Holdings.[10]  Because the SEC has not and cannot demonstrate that there are no facts in dispute pertaining to the defense of *res judicata*, its motion should be denied.

## POINT II

## THERE ARE MATERIAL FACTS IN DISPUTE REGARDING WHETHER THE SEC'S CLAIMS ARE BARRED BY THE NEW YORK SETTLEMENT

On the issue of the impact of the New York settlement agreement, and whether it constituted a defense to the SEC's claims, the District Court plainly opted not to "wade into the particulars of those facts."  Opinion at 8.  The Court stated that "this action is in the beginning stages" and that summary judgment "is inappropriate on these bases at this time (and as presented, ***the defenses raise triable issues of fact***."  Opinion at 8 (emphasis added)  Issues such as apparent authority and estoppel cannot be resolved because "there are triable issues on these questions." Opinion at 26.

## POINT III

## BY VIRTUE OF THE PLEA IN THE CRIMINAL CASE, THE SEC WOULD BE ENTITLED TO JUDGMENT RELATING TO RECYCLE TECH AND BLUE GEM

Counts 12 and 46 of the Criminal Indictment charged violations of New York's Martin Act in relation to two specific transactions, Blue Gem and Recycle Tech respectively.  Mr. Thompson pled guilty to those offenses and, given the elements of New York's Martin Act, the plaintiff would be entitled to judgment in relation to those transactions.  Notably, however, the SEC in this action declined to charge the Recycle Tech transaction, because it was charged in the Florida case, and so it does not seek a remedy in relation to that transaction.

The plea and the allocution in the criminal action address specifically the Recycle Tech and Blue Gem transactions, and go no farther.  Mr. Thompson was charged with but did not

---

[10] This case involves one other transactions, Blast Applications, that did not involve Kevin Sepe and would arguably not be barred by the prior Florida Action.

plead guilty to any wrongdoing in relation to the other transactions at issue in this case, *i.e*, Blast Applications, Mass Hysteria, Lyric Jeans and Smart Holdings.  Each of those transactions possessed their own unique characteristics and raised specific issues and defenses.  There was no mention of or reference to other transactions in relation to the plea, those issues were not litigated or determined in the criminal case, and the plaintiff is not entitled to judgment in relation to those transactions.

## POINT IV

### THE SEC HAS FAILED TO DEMONSTRATE THAT IT WOULD BE ENTITLED TO DISGORGEMENT OF ANY AMOUNT OTHER THAN $200,000 RELATING TO BLUE GEM

### 1.      Disgorgement of Blue Gem Amounts Received by Mr. Thompson

The Court has "broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits."  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996).  In determining an amount of disgorgement, the court looks to the amount "by which the defendant was unjustly enriched."  *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000).  While the Court is not required to determine the amount of defendant's gains "with exactitude," the amount of disgorgement must be based on a determination of the defendant's "profits causally connected to the violation."  *First Jersey*, 101 F.3d at 1475.  *SEC v. Alternative Green Techs. Inc.,* No. 11 Civ. 9056 (SAS), 2014 U.S. Dist. LEXIS 173251, at *9 (S.D.N.Y. Dec. 15, 2014) ("'court must focus on the extent to which a defendant has profited from'" his violation) (citation omitted).

Here, assuming that the plaintiff is entitled to an order of disgorgement against Mr. Thompson in relation to the Blue Gem transaction, the Court would have to determine the amount of profit that was received by this defendant, Anthony Thompson.  According to the records of that transaction, the only amounts that actually went to or for Mr. Thompson was a

total of $200,000.00.  Thompson Declaration ¶¶ 4-6.  The remainder was obtained by OTC

Solutions and either disbursed by it for various transactions costs.  *See SEC v. McCaskey*, 2002

U.S. Dist. LEXIS 4915 (S.D.N.Y. Mar. 26, 2002) (courts have discretion to reduce any

disgorgement amount by transaction costs that reduce the defendant's profit).  Even assuming the

continuing viability of disgorgement as a remedy, after the Supreme Court decision in *Kokesh v.*

*Securities and Exchange Commission*, 137 S. Ct. 1635 (2017), the Supreme Court has also

recently underscored that disgorgement must involve ill gotten gains actually received by the

defendant.  *Honeycutt v, United States*, 137 S. Ct. 1626 (2017).   Because the SEC has failed to

demonstrate that any amount other than the $200,000.00 was actually transferred to or obtained

by Mr. Thompson and his wife, that amount constitutes the appropriate disgorgement figure.

### 2.      Penalties and Injunctive Relief Should Not Be Awarded

As is eventually acknowledged by the plaintiff in its submission, whether any penalty

should be imposed, and the amount of it, are to be determined by the Court in light of all of the

facts and circumstances.  In deciding whether a civil penalty should be assessed, the court is

directed to consider "(1) the egregiousness of the defendant's conduct; (2) the degree of the

defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of

substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent;

and (5) whether the penalty should be reduced due to the defendant's demonstrated current and

financial condition."  *SEC v. Tavella*, 77 F. Supp. 3d 353, 362 (S.D.N.Y. 2015); *SEC v.*

*Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).

Courts have also considered other factors including "the adequacy of other criminal or

civil sanctions to punish the defendant" and hardships to the defendant's family.  *SEC v. First*

*AmeriFirst Funding Inc*., No. 3:07-cv-1188-D, 2008 U.S. Dist. LEXIS 36782, at *24 (N.D. Tex.

May 5, 2008) (citing *SEC v. Lewis*, 492 F. Supp. 2d 1173, 1174 (D.S.D. 2007)); *SEC v. Church*

*Extension of the Church of God*, 429 F. Supp. 2d 1045, 1050 (S.D. Ind. 2005); *SEC v. Balboa*, No. 11 Civ. 8731 (PAC), 2015 U.S. Dist. LEXIS 87281, at *13 (S.D.N.Y. July 6, 2015) (court may consider other remedies already imposed on the defendant to determine whether a penalty is "unduly harsh under the circumstances") (internal quotations and citations omitted); *SEC v. Conaway*, 695 F. Supp. 2d 534, 574 (E.D. Mich. 2010).  Application of those factors have led courts to note that he "defendant's net worth and corresponding ability to pay has proven to be one of the most important factors that district courts consider when determining how much of a civil penalty to assess."  *SEC v. Perez*, No. 09-cv-21977, 2011 U.S. Dist. LEXIS 132965, at *20 (S.D. Fla. Nov. 17, 2011) (finding that, based on his limited net worth and disgorgement order, "a civil penalty at the low end of the scale is appropriate" and imposing a penalty of $50,000.00). *See SEC v. Druffner*, 802 F. Supp. 2d 293, 298-99 (D. Mass. 2011) (confirming that a court "may consider a defendant's ability to pay when determining the amount of civil penalties to impose or whether to waive civil penalties" and holding that "imposition of civil penalties is unwarranted" in light of disgorgement order, limited resources and other criminal and civil penalties).

Also at issue in imposition of penalties is the number of violations.  Because the civil penalties provision permits the imposition of penalties "for each violation," courts have also had to grapple with the appropriate definition of a violation, particular where alleged conduct involves the same act committed multiple times.  *See Alternative Green Tech*, 2014 U.S. Dist. LEXIS 173251, at *22-23 (where SEC argued that the court should impose two penalties, based on the number of statutory violations, or 56 based on the number of defendant's acts, for a total of $36,400,000 as to corporate defendant, held that one penalty of $650,000.00 "is appropriate"); *Balboa*, 2015 U.S. Dist. LEXIS 87281, at *14 (where SEC sought a penalty for each transmission of inflated valuations for a total of $2.6 million, court rejected argument that each

23

transmission should be considered a separate violation and imposed two penalties for each of the securities offerings); *SEC v. Elliot*, No. 09 Civ. 7594 (KBF), 2012 U.S. Dist. LEXIS 82992, at *29-30 (S.D.N.Y. June 12 2012) (where court finds that Second or Third tier penalties are appropriate in relation to more than 900 sales of stock, held that "such an award would be unduly penalizing" and imposes $6,500 per transaction).  in relation to more than 900 sales of unregistered securities); *SEC v. IShopNoMarkup.com.Inc.,* 126 F. Supp. 3d 318, 332-33 (E.D.N.Y. 2015), *aff'd,* 694 F. App'x 853 (2d Cir. 2017) (where SEC advised court that it could consider defendant's conduct to be one violation, or "consider the sale to each of the more than 350 investors as separate violations, yielding a penalty of $38,500,000" held that "considering each sale to the 350 investors as a separate violation results in an 'unduly penalizing amount'" and imposes penalty of $330,000 based on three unregistered offerings); *SEC v. GTF Enters*., No. 10-cv-258 (RA), 2015 U.S. Dist. LEXIS 20355, at *11-13 (S.D.N.Y. Feb. 19, 2015) (discussing methods used by courts to determine the number of "violations" including number of statutes violated, number of transactions and holding that, because the court lacked detailed information about the defendant's conduct, imposing a single maximum penalty against each).

Here, the relevant factors support the imposition of no penalty.  First, and in relation to these transactions, Mr. Thompson has already paid a penalty amount to the SEC in the Florida Action.  He also entered into an agreement with the criminal authorities that called for the payment of additional amounts of approximately $896,000 and, because of inability to pay that amount, he was sentenced by the state court to a period of incarceration and remains in jail.

Clear also is that, at this point, he has no money.  After the Indictment in 2014, Mr. Thompson was not able to earn any significant income.  His family and he at that time still had access to funds from his earlier income that had been placed into family trusts, but those were

used over the years to pay the living expenses of his wife, his children and himself. As of 2017 and 2018, Mr. Thompson's wife began aggressively pursuing a costly matrimonial action and even litigating to try to obtain sole custody of their children. Fortunately, Mr. Thompson eventually regained joint custody of the children. His wife then began another litigation, this one designed to gain control of the family's remaining assets. Those litigations only further depleted the family's assets. Some funds remain in the trusts but his wife has control of those funds. Mr. Thompson himself possesses no bank or brokerage accounts or real property. When he completes his sentence, he will start completely from scratch with no funds left to pay expenses except what he is able to earn. At the same time, he has been the sole breadwinner for his wife and three young children throughout his adult life, and looks forward to continuing to provide support for the family after his release. He had obtained, and will hopefully be able to resume, a position in real estate, and his children will need from him as much financial support as he is able to provide. Thompson Decl. ¶ 13. Given these circumstances, and the seven years of litigation of these matters and the penalties that have already been imposed, no further penalty is warranted.

Finally, in with respect to injunctive relief, the SEC is not entitled to obtain, and the courts will not grant, injunctive relief that has already been obtained. Here, any appropriate injunctive relief was previously entered in the Florida Action and no further relief is warranted.[11]

## CONCLUSION

For the foregoing reasons, the Court should deny the SEC's request for partial summary judgment or, in the alternative, grant judgment to the SEC in relation to the Blue Gem

---

[11]   The district court in the Florida Action did not grant any injunction against violations of Section 17(b) and in fact held that Mr. Thompson had complied with that provision. That same result should hold here, particularly because Mr. Thompson is now long removed from the securities industry and the SEC has not and cannot demonstrate any likelihood of a future violation.

transaction, order disgorgement in the amount of $200,000.00 obtained by Mr. Thompson, and deny penalties or injunctive relief.

Dated:  March 13, 2019                        Respectfully,

                                              THOMPSON HINE LLP

                                      By:   /s/ Maranda E. Fritz
                                            Maranda E. Fritz
                                            335 Madison Avenue, 12th Floor
                                            New York, New York 10017
                                            Telephone:  (212) 344-5680
                                            Maranda.Fritz@Thompsonhine.com