UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    vs.<br><br>ANTHONY J. THOMPSON, JR., JAY FUNG, and ERIC VAN NGUYEN,<br><br>    Defendants,<br><br>    and<br><br>JOHN BABIKIAN and KENDALL THOMPSON,<br><br>    Relief Defendants,<br><br>NEW YORK COUNTY DISTRICT ATTORNEY,<br><br>    Intervenor. | Case No.: 14-cv-9126 (ALC) |

**RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND COUNTERSTATEMENT OF MATERIAL FACTS IN DISPUTE**

Defendant Anthony Thompson, by his attorneys, submits this response to Plaintiff's statement of material facts ("Statement") and counterstatement of material facts in dispute.

1.  Defendant does not dispute the facts asserted by Plaintiff in paragraphs 1 through 7 and avers that, as Plaintiff and the Court well knows, the charges and the language of the Indictment are not proof of any conduct by Mr. Thompson, that a prosecutor's press release is plainly proof of nothing and should not even have been referenced by the Plaintiff, that most of the 85 Counts in the original Indictment were dismissed, that by the time of Mr. Thompson's entry into a plea agreement only seven counts remained, and that Mr. Thompson admitted guilt

in relation to only two of the transactions that were referenced in the Indictment: Recycle Tech and Blue Gem.

2. With respect to paragraphs 8 and 9 of the Plaintiff's Statement, Mr. Thompson does not dispute that he entered into a plea agreement that provided for a plea to Counts 12 and County 46 of the Indictment, the charges relating to Blue Gem and Recycle Tech. Further, as part of a "repleader" arrangement, Mr. Thompson agreed to plead guilty to Count 2 of the Indictment, a charge of Scheme to Defraud under Penal Law § 190.65 which did not reference any particular transaction. Mr. Thompson refers the Court to the Plea Agreement for its contents.

3. With respect to paragraph 10 of the Plaintiff's Statement, Mr. Thompson does not dispute that he made an allocution in New York Supreme Court, refers the Court to the allocution for its contents, and notes that the allocution specifically references only the Recycle Tech and Blue Gem Enterprises transactions.

4. With respect to paragraphs 11 through 14 of the Statement, Mr. Thompson does not dispute that those aspects of the plea occurred and avers that at no time did he plead guilty to or admit any wrongdoing in relation to any other transaction including Lyric Jeans, Mass Hysteria, Smart Holdings or Blast Applications.

5. With respect to paragraphs 15 and 16, in which Plaintiff essentially repeats the allegations of the Complaint, Mr. Thompson does not dispute that the Plaintiff has made those claims but he has and he continues to dispute that he engaged in any improper conduct in relation to transactions other than Recycle Tech and Blue Gem.[1] In each and every instance except those identified herein, Defendant denied those allegations in his Answer to the Complaint and has

---

[1] Plaintiff suggests that Mr. Thompson's denials in his Answer were somehow deficient but then refers only to his response to paragraph 9 of the Complaint. In that particular instance, Mr. Thompson's denial was in fact limited because he had previously engaged in stock promotional activity.

2

continuously asserted that the transactions and disclosures were in full compliance with pertinent federal securities laws including Section 17(b) of the Exchange Act, that any investors had specifically sought information relating to potential penny stock investments, that each investor received disclosures in the newsletter that expressly stated that the stocks were highly speculative, that the investor should conduct his own research and due diligence, and that the newsletter was being compensated for its dissemination of the promotional material, and that the District Court in the Recycle Tech proceeding has already held that the disclosures properly conveyed to investors that the newsletter publisher was "bought and paid for."

6. With respect to paragraph 17, 18 and 19 of Plaintiff's statement, Mr. Thompson has denied that he engaged in violations alleged in the Plaintiff's Complaint except to the extent that he has acknowledged improper conduct in relation to Recycle Tech and Blue Gem.

7. With respect to paragraph 20, Mr. Thompson has admitted that he had previously engaged in promotional campaigns involving certain penny stocks.

8. With respect to paragraphs 21 through 22 of Plaintiff's Statement, Mr. Thompson has denied that the transactions in which he participated were part of a scheme with common components.  Each of the particular issuers had different characteristics and attributes, each newsletter contained different information concerning the issuer and the industry or sector in which they operated, and each properly advised the reader that the publisher was compensated for the promotional campaign.

9. With respect to Paragraph 23 of Plaintiff's Statement, Mr. Thompson has consistently denied that his newsletters were misleading or contained a "barrage of falsehoods."

10. With respect to paragraphs 24 and 25 of the Plaintiff's Statement, Mr. Thompson has consistently denied that his newsletters contained false information and avers that any

statements concerning potential price movements, due diligence or the company's prospects were in any way actionable or misleading.

11. With respect to paragraph 26 of the Plaintiff's Statement, Mr. Thompson admits that his company sold shares of the promoted stocks, denies that it sold those stocks at "pumped" prices, and denies that his conduct caused a "crash in value" that left "unwitting" investors with losses.

12. With respect to paragraph 27 of the Plaintiff's statement, Mr. Thompson admits that the received compensation for the promotional campaigns but denies the assertion that he was "unjustly enriched" in the amount identified, and avers that those amounts obtained by Mr. Thompson's company were primarily used for the purpose and operation of his business.

13. With respect to paragraphs 28 through 30 of Plaintiff's Statement, Mr. Thompson admits that OTC Solutions received 18 million shares of stock of Blast Application, that the stock was for promotional campaigns to be run by three entities and individuals each of whom was receiving 6 million shares, and that the compensation was properly disclosed in the newsletter.

14. With respect to paragraphs 31 through 33 of the Plaintiff's Statement, Mr. Thompson admits that Microcapster received shares of Blue Gem and that disseminated newsletters relating to Blue Gem. Mr. Thompson denies that the newsletters were misleading, denies that he received "proceeds" of $485,366, and avers that he received only a total of $200,000.00 in relation to Blue Gem. *See* Declaration of Anthony Thompson ¶¶ 4-6.

15. With respect to paragraphs 34 through 36 of Plaintiff's Statement, Mr. Thompson admits that OTC Solutions received shares of Lyric Jeans and disseminated newsletters relating to the company. Mr. Thompson denies that he "earned" $660,578.96 from sales of Lyric and

avers that the bulk of the funds received from the promotional campaign were spent on costs associated with the promotional campaign. *See id.* ¶ 7.

16. With respect to paragraphs 37 through 39 of Plaintiff's Statement, Mr. Thompson denies that he received shares of Smart Holdings. He admits that he was involved in the dissemination of newsletters that disclosed cash compensation. He denies that he "earned" $525,000 from sales of stock and avers that amounts received by OTC Solutions for promotional campaigns were then primarily directed to payment of the costs associated with the promotion. *See id.* ¶ 8.

17. With respect to paragraphs 40 through 42 of the Plaintiff's Statement, Mr. Thompson denies that he received stock of Mass Hysteria, admits that he was involved with the dissemination of promotional newsletters, and denied that he "earned at least" $564,412.00 from sales of stock. *See id.* ¶ 9.

18. With respect to paragraph 43 of the Plaintiff's Statement, Mr. Thompson denied that he obtained the stated amounts as a result of any improper schemes, avers that stock and proceeds of sales of stock were conducted by the companies, Microcapster or OTC Solutions, confirms that the bulk of the proceeds of sales of stock were used to pay the costs associated with the promotional campaign, and that he personally received only those amounts that were paid to him by the company. *See id.* ¶ 10.

## COUNTERSTATEMENT OF MATERIAL FACTS IN DISPUTE

19. In the Florida Action, the Commission alleged, inter alia, that Thompson and OTC participated in a pump-and-dump scheme, "concocted" and "orchestrated" by Kevin Sepe, along with Fung, Sepe, Ronnie Halperin and others. *See* Declaration of Maranda Fritz ("Fritz Decl.") Exhibit 2, ¶ 4. The SEC alleged that Thompson and OTC and others were hired by Sepe to promote Recycle Tech stock through electronic newsletters, in exchange for shares of Recycle

Tech stock. *Id.* ¶ 20.  The SEC further alleged that Thompson, OTC, Sepe and others violated Section 5(a) and (c) of the Securities Act through the sale of unregistered shares of Recycle Tech; Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 by engaging in "scalping," i.e., selling shares of Recycle Tech recommended by the newsletters without proper disclosures; and Section 17(b) of the Securities Act by touting Recycle Tech without disclosing his compensation.  *Id.* ¶¶ 89-95, 99-101, 105-108.

20. Although the initial complaint in the Florida Action focused on a particular company, Recycle Tech, it quickly became clear that the scope of that action was much broader: it included the time period from January 2009 through December 2010 and it extended to all of the other companies that involved Sepe including Blue Gem, Lyric Jeans and Mass Hysteria.  The same time period and set of transactions were encompassed in the SEC's deposition of Anthony Thompson in the Florida Action.  During that deposition, the SEC inquired about Blast Applications, Smart Holdings, Blue Gem, Lyric Jeans, and other deals with Kevin Sepe and the SEC demanded documents from Mr. Thompson relating to all of the Sepe transactions.

21. Because both the Florida and New York offices of the SEC were focusing on and demanding information regarding the same set of transactions, Mr. Thompson's counsel objected to the duplicative demands and proceedings.  The Florida court then asked the SEC to explain the scope of its requests and their relevance to the Florida Action.  The SEC responded that its case encompassed the "numerous promotional campaigns," particularly those involving "the main architect of this whole fraud," Kevin Sepe.  *See* Exhibit 1 to the Fritz Decl. at Exhibit 14: Tr. of Hearing of October 31, 2013 at 53:8-57:18.  Based on the SEC's assertion that the Florida Action included not just Recycle Tech but the "numerous promotional campaigns" involving Kevin Sepe, the Court held that the documents regarding Blue Gem, Mass Hysteria, Lyric Jeans

6

and Smart Holdings were "relevant and discoverable."  Thus, the SEC prevailed in its assertion that the transactions at issue in this case were part of the Florida Action.

22. Having received and presumably reviewed those documents, the SEC in the Florida action obviously could have, but declined to, amend its complaint.

23. After the SEC in the Florida Action was able to persuade the court that all of the Sepe transactions were properly included in its case and were relevant to its demand for injunctive relief, the parties resumed their settlement discussions.  Counsel for Mr. Thompson agreed to full injunctive relief including a penny stock bar, and an agreement to settle the Florida Action was reached in mid-January of 2014.  Pursuant to the parties' settlement agreement, at the SEC's insistence, Thompson and OTC deposited $493,239.76 into counsel's trust account to cover the agreed-upon amount for disgorgement, prejudgment interest and civil penalties, and entered into Consents of Final Judgment of Permanent Injunction and Other Relief, drafted by the SEC, filed on January 13, 2014 (the "Consents").  *Id.* at Exhibits 21-22.  Pursuant to the Consents, Thompson and OTC, without admitting or denying the allegations in the Complaint, consented to entry of a final judgment that, inter alia, (a) permanently restrains and enjoins them from violations of Sections 5(a), 5(c) and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5; (b) orders payment of disgorgement in the amount of $349,504.61 plus prejudgment interest thereon in the amount of $23,735.15, jointly and severally; (c) orders payment of a civil penalty of $120,000, jointly and severally; and (d) imposes a penny stock bar.  *Id.*

24. The Florida Court issued Final Judgments of Permanent Injunction and Other Relief (the "Final Judgments") against Thompson and OTC on February 14, 2014, entering the

injunctions, ordering payment of disgorgement, interest and civil penalties, and imposing the penny stock bar consistent with the terms of the Consents. *Id.* at Exhibits 23-24.

25. Given the fact that two SEC regional offices were focused on the same conduct, Mr. Thompson was adamant that any settlement would have to include both the Florida Action and the New York Proceeding. To that end, on December 16, 2013, counsel for Thompson emailed Peter Pizzani (Senior Counsel at the DOE in New York) to try to "schedule a time to talk about the status of this matter and [a] possible resolution." *Id. at* Exhibit 26: Emails dated December 16, 2013-December 20, 2013. Mr. Pizzani responded to this email on December 16, 2013, copying other counsel for the DOE (Michael Osnato, then assistant director of the New York Regional Office), stating that DOE would be prepared to discuss "and ultimately recommend" a resolution that included an antifraud injunction, a penny stock bar, as well as other collateral bars, disgorgement of proceeds from Blast plus prejudgment interest, and "the payment of penalty, amount to be determined." *Id.*

26. On December 19, 2013, counsel for Thompson responded to Mr. Pizzani's December 16, 2013 email, stating that he had spoken to the client, that the client was "genuinely open to discussing the terms you laid out in your email," and suggesting a conference call the following day. *Id.* Counsel for Thompson spoke with Mr. Pizzani and Mr. Osnato regarding settlement on December 20, 2013.

27. Following further discussions, on January 7, 2014, the Division (through Mr. Pizzani) sent counsel for Thompson a settlement term sheet. *Id.* at Exhibit 28: Letter & Term Sheet. Notably, in the January 7, 2014 letter, Mr. Pizzani made clear he was expressing the position of the DOE, and had actual authority to negotiate and enter into settlement agreements on behalf of the DOE, with the settlement subject only to approval by the Commission:

> As you know, any settlement must be approved by the full Commission and the terms outlined herein are representative only of the position of the Division of Enforcement. The staff will not recommend any settlement offer until we receive proof that all funds to [sic] paid pursuant to the proposed settlement have been placed in escrow.

*Id.*

28. Counsel for Mr. Thompson made revisions to the term sheet in redline and returned it to Mr. Pizzani and Mr. Osnato on January 9, 2014. Among the changes, Thompson sought confirmation that any settlement would cover "any and all claims arising from the Commission's investigation pursuant to a formal order of investigation in re Blast Applications, Inc. (NY-8264)," with the exception of claims in the Recycle Tech Action. *Id.*

29. Counsel for Thompson had several telephone calls with Mr. Pizzani and Mr. Osnato regarding settlement and the term sheet in the week after January 7, 2014. During one of these calls, Mr. Osnato and Mr. Pizzani confirmed that the settlement would extend to all conduct that was under investigation in the New York Proceeding, and agreed to reduce the total settlement amount for disgorgement, penalties and interest to approximately $345,000 (plus interest through August 13, 2013), as requested by Thompson. Mr. Osnato suggested that the parties effectuate settlement by an Offer of Settlement, rather than the term sheet originally proposed by the DOE. Mr. Osnato further indicated the DOE would prepare an Offer of Settlement if Thompson would deposit the settlement funds into counsel's trust account. Thompson's counsel agreed with this approach.

30. At that point in January 2014, Mr. Thompson understood that there was an agreement on the essential terms in relation to both the New York and Florida actions and so he proceeded to finalize both. On January 13, 2014, the settlement documents in the Florida Action were executed and, on January 15, 2014, counsel for Thompson emailed Mr. Pizzani in New

York to inform him that "[t]he money ($345,000 plus amount roughly equal to prejudgment interest through August 2013) is in [sic] currently my trust account for use in settling this matter subject to consideration and approval by the Commission." *Id.* at Exhibit 29: Email Baker/Pizzani January 15, 2014.  The New York DOE attorneys then drafted and sent a proposed Offer of Settlement to counsel for Thompson by email.  *Id.* at Exhibit 30: Email communication dated January 15, 2014.  That proposed Offer of Settlement failed to include that parties' agreement that the settlement covered all of the companies and conduct being investigated by the SEC and so counsel for Thompson proposed changes to the Offer of Settlement to ensure it correctly identified the scope of the settlement agreed upon by the parties.

31. After trading further drafts of the Offer of Settlement, counsel for Thompson had a phone call with Mr. Pizzani, Mr. Osnato and Thomas Smith (Assistant Regional Director in the New York Office) regarding settlement on March 28, 2014. During the conversation, Mr. Osnato suggested that the parties enter into separate agreement to confirm that the settlement included all companies and conduct under investigation, rather than making further amendments to the Offer of Settlement.  *Id.* at Baker Decl. ¶ 26.

32. Following the March 28, 2014 telephone call, counsel for Thompson emailed Mr. Pizzani to confirm their conversation:

> [A]s we have discussed several times as part of our settlement negotiations, our understanding is that this Offer of Settlement/Agreement is meant to cover all of the legal and factual issues referenced in all subpoenas issued under the Formal Order of Investigation in the Matter of Blast Applications, Inc. (NY-8264). Can the Staff please confirm that our understanding is correct and consistent with the scope of the recommendation being presented by the Staff to the Commission in this matter.

*Id.* at Exhibit 25: March 28, 2014 Email.

10

33. Mr. Pizzani responded to this email, copying Mr. Osnato and Thomas Smith, the same day as follows: "This will confirm that your understanding is correct and consistent with the scope of the recommendation being presented to the Commission." *Id.*

34. After that separate agreement was confirmed, Thompson agreed to execute and deliver the Offer of Settlement as drafted by the DOE. The SEC later sought some additional revisions, and Thompson submitted the fully executed Offer of Settlement to the Division on June 6, 2014. *Id.* at Exhibit 31: Offer of Settlement.

35. After delivering the executed Offer of Settlement, counsel for Thompson contacted Mr. Pizzani on several occasions to determine the status of the settlement and to see when the Offer of Settlement would "get into the queue to be approved by the Commission." *Id.* at Exhibit 32:  Email from Brent Baker dated July 16, 2014.  Mr. Pizzani did not give any indication that there were any problems with the settlement, or that additional approval was necessary from within the Division itself. Rather, he responded, simply, "It is being moved along," and "things were delayed because we were waiting for the other offer [from Fung and Pudong]." *Id.*

36. At all relevant times during the settlement discussions, the Division Staff—including through Mr. Pizzani, Mr. Osnato and Mr. Smith—represented, through statements and actions, that they had full and actual authority to negotiate and enter into settlement on behalf of the DOE, subject only to approval by the Commission.

37. Thompson understood - based on the representations of the DOE - that the DOE had agreed to and was in the process of presenting the executed Offer of Settlement to the Commission for approval, accompanied by the recommendation of the DOE that the Commission accept the Offer.

38.     Unexpectedly, in two telephone calls in August 2014, Thomas P. Smith and Peter Pizzani of the DOE in New York advised counsel for Thompson that they had not submitted, and would not be submitting, the Offer of Settlement to the Commission with a recommendation to approve the settlement.  Mr. Smith and Mr. Pizzani told counsel for Thompson that they were refusing to go forward with the agreement because they had "come to learn of new information" since the time the agreement was negotiated.  *Id.* at Baker Decl. ¶ 34.  This new information, they stated, consisted of the fact that Mr. Thompson had engaged in the same conduct but with respect to "newly discovered" issuers - Smart Holdings, Mass Hysteria, Blue Gem and Lyric Jeans."  *Id.*

39.     That claim was contrary to the DOE's multi-year investigation, the broad scope of the investigative subpoenas, and the express agreement with DOE incorporating and covering those other transactions.  *Id.* ¶ 35 and Exhibits 33 and 34.

40.     On August 18, 2014, counsel for Thompson and Fung had an escalation call with DOE Staff and the Director of the Division of Enforcement, Andrew Ceresney, regarding the DOE's attempted repudiation of its agreement to submit the Offer of Settlement to the Commission and to recommend settlement.  During that escalation call, and at a subsequent meeting with counsel, Mr. Ceresney insisted that any agreement negotiated by DOE Staff is final and binding only if approved by him.  *Id.* ¶ 36.  Mr. Ceresney stated that the DOE had no obligation to honor its agreement to submit the Offer of Settlement to the Commission, and recommend its approval, because he had not approved it – an assertion that contradicted the

representations made by the DOE Staff, including Mr. Pizzani, Mr. Osnato and Mr. Smith, in negotiating and entering into the agreement on behalf of the DOE with Mr. Thompson. *Id.*

Dated: March 13, 2019 Respectfully,

THOMPSON HINE LLP

By: /s/ Maranda E. Fritz
Maranda E. Fritz
335 Madison Avenue, 12th Floor
New York, New York 10017
Telephone: (212) 344-5680
Maranda.Fritz@Thompsonhine.com